[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-13596

_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS, 6:14-cv-06000-GAP-TBS

AUTOMOTIVE ALIGNMENT & BODY SERVICE, INC., d.b.a. Pitalo Auto
Paint & Body,
ALEXANDER BODY SHOP, LLC, et al.,

Plaintiffs-Appellants,

versus

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
STATE FARM FIRE & CASUALTY COMPANY, et al.,

Defendants-Appellees.

_____

No. 16-13601

_____

D.C. Docket Nos.  6:14-md-02557-GAP-TBS, 6:14-cv-06001-GAP-TBS

GARY CONNS COLLISION CENTER, INC.,
CROSS PAINT & BODY SHOP, INC., et al.,

Plaintiffs-Appellants,

versus

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
STATE FARM FIRE & CASUALTY COMPANY, et al.,

Defendants-Appellees.

_____

No. 16-15467
_____

D.C. Docket Nos.  6:14-md-02557-GAP-TBS, 6:14-cv-06003-GAP-TBS

ALPINE STRAIGHTENING SYSTEMS, d.b.a. Alpine Body Shop,
A.F. COLLISION REPAIR, INC., et al.,

Plaintiffs-Appellants,

versus

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
MID-CENTURY INSURANCE COMPANY, et al.,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(March 6, 2020)

Before WILLIAM PRYOR, MARTIN, and KATSAS,* Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

---

\* Honorable Gregory G. Katsas, United States Circuit Judge for the District of Columbia Circuit, sitting by designation.

2

These consolidated appeals require us to decide two jurisdictional questions before reaching the merits: whether the district court had jurisdiction to adjudicate amended complaints filed after its earlier orders of dismissal became final judgments, and whether we have jurisdiction to review an order that the appellants failed to designate in their notice of appeal. Three groups of automotive body shops in Mississippi, Indiana, and Utah filed complaints against the major automobile insurance companies. They asserted claims for relief under the Sherman Act, 15 U.S.C. § 1, and state law based on the insurance companies' alleged anticompetitive practices. The district court dismissed their first amended complaints with leave to amend within a specified time. The Mississippi body shops timely amended their complaint, but the Indiana and Utah body shops missed the deadline and filed untimely second amended complaints. Under our precedent, the orders dismissing the first amended complaints in the Indiana and Utah actions became final judgments when the deadline to amend expired. The district court never set aside those final judgments, so it was without jurisdiction to permit the amendments and to adjudicate the second amended complaints. We must vacate the orders that purported to do so.

Although the Mississippi body shops timely amended their complaint, they failed to designate the interlocutory order dismissing their antitrust claims in their notice of appeal. But we conclude that we may review the order because the shops

designated the final judgment into which the interlocutory order merged. On the merits, we affirm the dismissal of the Mississippi body shops' antitrust claims and the denial of their motion to reconsider the dismissal of those claims. We also affirm the dismissal of all but two of their claims under state law. Because two body shops have adequately alleged claims of tortious interference, we vacate the dismissal of those claims and remand for further proceedings.

## I. BACKGROUND

These appeals arise from three lawsuits filed in Mississippi, Indiana, and Utah by body shops that repair vehicles for individuals insured by the major automobile insurance companies. The Judicial Panel on Multidistrict Litigation transferred the actions to the Middle District of Florida for pretrial proceedings. We recently decided en banc five similar appeals arising from the same multidistrict litigation. *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249 (11th Cir. 2019) (en banc).

Here, as in *Quality Auto*, the body shops allege that the insurance companies have conspired to depress the prices they pay for repairs the body shops perform for their insureds. The leader of this alleged conspiracy is State Farm, which sets a "market rate" for labor in a geographic area using an electronic survey of shops in the area and refuses to pay more for labor than the survey-determined market rate. But the "survey" State Farm conducts is allegedly more sham than survey. State

Farm allegedly uses faulty methods and outright manipulation of data to generate "market rates" that are well below the real market rates for labor in a geographic area. Still, State Farm advises the shops that it will pay no more for labor than the "market rate" determined by its survey. And the other insurance companies also advise the body shops that they will pay no more for labor than the "market rate" determined by State Farm.

The body shops also allege that the insurance companies use other unsavory business practices to reduce the prices they pay for repairs. For example, the insurance companies allegedly refuse to pay for necessary repairs and procedures, and they allegedly require the body shops to use subpar "aftermarket" parts instead of new parts. They also allegedly "steer" their insureds away from noncompliant body shops and toward body shops that comply with their pricing demands and other requirements. If an insured plans to use a noncompliant body shop for repairs, the insurance company allegedly will tell its insured that the body shop has had quality issues, charges more than other shops, takes longer than other shops, or performs work that the insurance company cannot guarantee. Some body shops have lost prospective customers because of the insurance companies' alleged steering. The body shops also allege that the insurance companies collectively agree to steer customers away from noncompliant body shops.

Based on these allegations, the body shops assert claims of horizontal price-

fixing and group boycott in violation of the Sherman Act, 15 U.S.C. § 1, and claims of quantum meruit and tortious interference under state law. The Mississippi body shops also bring a claim under a state statute that prohibits insurers from requiring their insureds to use a particular body shop for repairs. *See* Miss. Code Ann. § 83-11-501.

The district court dismissed the first amended complaints in all three actions for failure to state a claim, Fed. R. Civ. P. 12(b)(6). But the orders of dismissal were without prejudice to the body shops' right to amend their complaints within a specified time. The day before their deadline expired, the Mississippi body shops moved for an extension of time to amend their complaint. They filed their second amended complaint two days later, and the district court accepted the complaint as timely. But the Indiana and Utah body shops missed the deadline to amend their complaints. They instead filed untimely second amended complaints without ever moving for an extension of time.

The insurance companies in the Indiana and Utah actions moved to strike the untimely second amended complaints and close the cases. They argued that the first orders of dismissal became final judgments when the time to amend expired without the body shops either filing an amended complaint or moving for an extension of time. Relying on our decision in *Hertz Corporation v. Alamo Rent-A-Car, Incorporated*, 16 F.3d 1126 (11th Cir. 1994), the insurance companies argued

6

that the district court lost its prejudgment powers to extend the time to amend when the first orders of dismissal became final.

The Indiana and Utah body shops opposed the motions to strike and argued that they failed to timely amend their complaints because of excusable neglect. The Indiana body shops explained that they experienced problems with the electronic filing system, which caused them to miss the deadline to amend by several hours. And the Utah body shops explained that they missed the deadline to amend by two days because they miscalculated the time to amend under the Federal Rules of Civil Procedure.

The district court denied the insurance companies' motions to strike. It construed the body shops' briefs opposing the motions to strike as motions for an after-the-fact extension of time to amend their complaints, which it granted. *See* Fed. R. Civ. P. 6(b)(1)(B). The district court allowed the Indiana and Utah actions to proceed based on the untimely second amended complaints.

The insurance companies moved to dismiss the second amended complaints in all three actions for failure to state a claim, Fed. R. Civ. P. 12(b)(6). The district court referred the motions to a magistrate judge to prepare a report and recommendation on the body shops' claims under state law, but it ruled that the complaints failed to state claims of horizontal price-fixing or group boycott under the Sherman Act and dismissed those claims with prejudice. The body shops

7

moved for reconsideration of those dismissals based on alleged newly discovered evidence of price-fixing, Fed. R. Civ. P. 59(e), but the district court denied the motions. It reasoned in part that the body shops failed to show the new evidence was previously unavailable, so they could not obtain relief based on that evidence. After the magistrate judge issued a report and recommendation on the claims under state law, the district court also dismissed those claims, Fed. R. Civ. P. 12(b)(6).

The body shops appealed. In their notices of appeal, the Mississippi and Indiana body shops designated only the order denying their motion for reconsideration and the final order dismissing their claims under state law. They did not designate the interlocutory order dismissing their antitrust claims. The Utah body shops designated all three of these orders in their notice of appeal.

## II. STANDARDS OF REVIEW

We review jurisdictional questions and the dismissal of a complaint *de novo*. *Ehlen Floor Covering, Inc. v. Lamb*, 660 F.3d 1283, 1287 (11th Cir. 2011); *Bourtzakis v. U.S. Att'y Gen.*, 940 F.3d 616, 619 (11th Cir. 2019). We review the denial of a motion for reconsideration, Fed. R. Civ. P. 59(e), for an abuse of discretion. *Lockard v. Equifax, Inc.*, 163 F.3d 1259, 1267 (11th Cir. 1998).

## III. DISCUSSION

We divide our discussion in five parts. First, we explain that we lack jurisdiction to decide the merits of the Indiana and Utah appeals. Second, we

8

explain that we have jurisdiction to review the order dismissing the Mississippi body shops' antitrust claims. Third, we conclude that the district court correctly dismissed those antitrust claims. Fourth, we conclude that the district court did not abuse its discretion when it denied the Mississippi body shops' motion to reconsider its dismissal of their antitrust claims. And fifth, we conclude that the district court correctly dismissed most of the Mississippi body shops' claims under state law.

### A. *We Lack Jurisdiction to Decide the Merits of the Indiana and Utah Appeals.*

We directed the parties in the Indiana and Utah appeals to address whether the body shops' failure to timely amend their complaints deprives us of jurisdiction to decide the merits of those appeals under *Hertz Corporation v. Alamo Rent-A-Car, Incorporated*, 16 F.3d 1126 (11th Cir. 1994). The insurance companies argue that we lack jurisdiction because the orders dismissing the first amended complaints became final judgments under *Hertz* when the deadline to amend expired. The body shops respond that any error in adjudicating the untimely complaints was harmless, Fed. R. Civ. P. 61, and does not deprive us of jurisdiction. We agree with the insurance companies that *Hertz* controls.

In *Hertz*, we considered the effect of a plaintiff's failure to timely amend its complaint after the district court dismissed the complaint with leave to amend within a specified time. 16 F.3d at 1127–28. After the deadline to amend expired,

9

one of the defendants, Alamo Rent-A-Car, moved the district court to amend the judgment, Fed. R. Civ. P. 59(e), to a dismissal with prejudice. *Hertz*, 16 F.3d at 1128. The district court granted the motion and entered an order dismissing Hertz's complaint with prejudice as to Alamo. *Id.* We held that the district court lacked jurisdiction to amend the judgment because Alamo's Rule 59(e) motion was untimely. *Id.* at 1132–33. We explained that the time to move to amend a judgment under Rule 59(e) begins to run upon the entry of a final judgment. *Id.* at 1132. And relying on an earlier decision, we held that an order dismissing a complaint with leave to amend within a specified time becomes a final judgment if the deadline to amend expires without the plaintiff amending its complaint or seeking an extension of time. *Id.* 1132–33 (citing *Schuurman v. Motor Vessel Betty K V*, 798 F.2d 442 (11th Cir. 1986)). Because Alamo did not file a timely postjudgment motion, we concluded that the district court "surrendered jurisdiction over the dispute between Hertz and Alamo" when the deadline to amend the complaint expired. *Id.* at 1133.

*Hertz* establishes that an order dismissing a complaint with leave to amend within a specified time becomes a final judgment if the time allowed for amendment expires without the plaintiff seeking an extension. *Id.* at 1132–33. And when the order becomes a final judgment, the district court loses "all its prejudgment powers to grant any more extensions" of time to amend the complaint. *Id.* at 1133. The only recourse for a plaintiff who seeks to set aside the

10

final judgment is to appeal, Fed. R. App. P. 3, move to alter or amend the judgment, Fed. R. Civ. P. 59(e), or move for relief from the final judgment, Fed. R. Civ. P. 60(b).

The orders dismissing the first amended complaints in the Indiana and Utah actions became final judgments under *Hertz* when the body shops missed their deadline to amend. The district court dismissed the body shops' first amended complaints with leave to amend within a specified time, and the Indiana and Utah body shops missed the deadline to amend without ever seeking an extension of time. So the orders of dismissal became final judgments when the deadline to amend expired. *See Hertz*, 16 F.3d at 1132–33. The body shops never appealed those final judgments, so we lack appellate jurisdiction to review them. *See* 28 U.S.C. § 1291. And they never moved to set aside those final judgments under Rules 59(e) or 60(b), so the district court "surrendered jurisdiction" of the Indiana and Utah actions when the deadline to amend expired. *Hertz*, 16 F.3d at 1133. The district court's orders entered after that time were "a nullity" and must be vacated. *Id.*

Instead of recognizing that its first orders of dismissal became final judgments when the deadlines to amend expired, the district court relied on Rule 6(b)(1)(B) to extend the time for the body shops to file their second amended complaints after the original deadlines expired. That rule provides, "When an act

11

may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). Although the body shops never moved for relief under Rule 6, the district court construed their briefs opposing the insurance companies' motions to strike their second amended complaints as motions for an extension of time under Rule 6(b)(1)(B). So construed, the district court granted the motions and allowed the Indiana and Utah actions to proceed based on the untimely second amended complaints.

The district court erred. Rule 6(b)(1)(B) does not allow a district court to extend the time for a party to act after it has entered a final judgment. Although in *Hertz* we reserved the question whether a district court may grant a postjudgment extension of time to amend a complaint under Rule 6(b)(1)(B), *see* 16 F.3d at 1133 n.13, we now hold that the rule does not permit postjudgment extensions of time.

Rule 6(b)(1)(B) does not apply postjudgment for two reasons. First, the general/specific canon requires that we not interpret the general provision for a time extension in Rule 6(b)(1)(B) to circumvent the specific requirements for obtaining relief from a final judgment in Rules 59(e) and 60(b). And second, Federal Rule of Appellate Procedure 4(a) contains an exhaustive list of the postjudgment motions available to litigants under the Federal Rules of Civil Procedure, but it omits motions under Rule 6(b)(1)(B) from the list. That omission

12

is best explained by concluding that Rule 6(b)(1)(B) does not apply postjudgment.

The general/specific canon makes clear that a district court may not use Rule 6(b)(1)(B) to relieve a party from the effects of a final judgment. When a civil action concludes without a trial, the Federal Rules of Civil Procedure specifically provide two ways to disturb a final judgment. *See* Fed. R. Civ. P. 59(e) ("Motion to Alter or Amend a Judgment"); Fed. R. Civ. P. 60(b) ("Grounds for Relief from a Final Judgment"). The Rules Committee knew how to provide for relief from a final judgment, and when it did so, it always used the term "judgment" and carefully limited the time and circumstances in which a party may ask a court to disturb the judgment. *See* Fed. R. Civ. P. 59(e) (motions to alter or amend a judgment "must be filed no later than 28 days after the entry of the judgment"); Fed. R. Civ. P. 60(c)(1) (motions for relief from judgment based on excusable neglect must be filed "no more than a year after the entry of the judgment"). In contrast to Rules 59 and 60, Rule 6(b)(1)(B) neither uses the word "judgment" nor imposes a time limit for seeking a post-expiration extension of time based on excusable neglect. We cannot read Rule 6(b)(1)(B), a general provision governing extensions of time, to circumvent the specific time limits in Rules 59 and 60 that exist to protect the finality of judgments. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter

13

specifically dealt with in another part of the same enactment." (alteration omitted) (internal quotation marks omitted)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 28, at 183.

And to be clear, circumvention of the time limits in Rules 59 and 60 is exactly what affirming the use of Rule 6(b)(1)(B) to set aside a final judgment would entail. If we read Rule 6(b)(1)(B) to apply postjudgment, a plaintiff could seek a postjudgment extension of time to amend its complaint based on excusable neglect at *any time* after the entry of judgment. That reading would turn the time limits for seeking relief from a final judgment in Rules 59 and 60 into surplusage. *See* Scalia & Garner, *Reading Law* § 26, at 174. Reading the Rules as a whole makes it clear that postjudgment relief is governed by Rules 59(e) and 60(b), not Rule 6(b)(1)(B). *See id.* § 24, at 167 ("The text must be construed as a whole.").

Federal Rule of Appellate Procedure 4(a) also provides strong evidence that Rule 6(b)(1)(B) does not apply postjudgment. The time to appeal begins to run upon the entry of a final judgment, Fed. R. App. P. 4(a)(1)(A), and the Appellate Rules toll that time only upon the filing of specified postjudgment motions, *id.* r. 4(a)(4)(A). A motion under Rule 6(b)(1)(B) is not one of the tolling motions identified in Appellate Rule 4(a)(4)(A), which otherwise lists *all* the postjudgment motions allowed by the Federal Rules of Civil Procedure. *See id.* The omission of Rule 6(b)(1)(B) strongly suggests that it operates only prejudgment. After all, it

14

would be odd for the Federal Rules silently to create a single postjudgment motion that does not toll the time to appeal. The omission of Rule 6(b)(1)(B) from Appellate Rule 4(a)(4)(A) is better explained by concluding that a motion under Rule 6 is not a postjudgment motion *at all* than by concluding that it is the lone postjudgment motion that does not toll the time to appeal.

Rule 6(b)(1)(B) did not empower the district court to set aside the final judgments against the Indiana and Utah body shops. The only remaining question is whether we may construe the district court's actions under Rule 6 as granting a postjudgment motion under Rules 59(e) or 60(b). But we do not need to decide that question because the body shops have waived any argument that we should construe the orders in that manner.

We directed the parties in the Indiana and Utah appeals to file supplemental briefs about whether we should construe the grant of relief under Rule 6(b)(1)(B) as granting a postjudgment motion under Rules 59(e) or 60(b). In response to that order, the body shops wrote, "This Court should not proceed under Rules 59 or 60(b)." The insurance companies likewise responded that we should not construe the district court as having granted relief under Rules 59(e) or 60(b). Because the parties agree that we should not construe the district court as having granted a postjudgment motion under Rules 59(e) or 60(b), we need not decide whether we could do so.

15

The district court never vacated its orders dismissing the first amended complaints, so it "surrendered jurisdiction" of the Indiana and Utah actions when the body shops' deadline to amend their complaints expired. *Hertz*, 16 F.3d at 1133. And the body shops never appealed those orders, so we cannot review them now, long after the deadline to appeal has expired. The orders dismissing the first amended complaints are the operative final judgments that bind the parties in the Utah and Indiana actions.

### B. We Have Jurisdiction to Review the Dismissal of the Mississippi Body Shops' Antitrust Claims.

Federal Rule of Appellate Procedure 3(c)(1)(B) provides that a "notice of appeal must . . . designate the judgment, order, or part thereof being appealed." Fed. R. App. P. 3(c)(1)(B). Although we must "construe Rule 3 liberally when determining whether it has been complied with, noncompliance is fatal to an appeal." *Smith v. Barry*, 502 U.S. 244, 248 (1992). The Supreme Court has explained that "Rule 3's dictates are jurisdictional in nature, and their satisfaction is a prerequisite to appellate review." *Id.*; *see also Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317 (1988); *Gonzalez v. Thaler*, 565 U.S. 134, 147 (2012).

Because the content requirements of Rule 3 are jurisdictional, we must assure ourselves that the Mississippi body shops complied with them before reaching the merits. In their notice of appeal, the shops designated only the order denying their motion for reconsideration of their antitrust claims and the final order

16

dismissing their remaining claims under state law. They did not designate the earlier interlocutory order that dismissed their antitrust claims. For that reason, some of the insurance companies argue that we lack jurisdiction to review that undesignated order.

We first acknowledge that recent decisions of the Supreme Court call into question its earlier decisions, *see Smith*, 502 U.S. at 248; *Torres*, 487 U.S. at 317, that the content requirements for notices of appeal are jurisdictional. In recent years, the Supreme Court has been careful to distinguish between jurisdictional rules, which define the cases or persons within a court's adjudicatory authority, and mandatory claim-processing rules, which govern the orderly process of litigation. *See, e.g.*, *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1848–49 (2019). The Court has held that time limits to file an appeal are jurisdictional if they appear in a statute, *Bowles v. Russell*, 551 U.S. 205, 206–07 (2007), but not if they appear in a court-made rule, *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 16–17 (2017). It has also held that other time limits in court-made procedural rules are nonjurisdictional claim-processing rules. *See Eberhart v. United States*, 546 U.S. 12, 15–16 (2005) (time limit to move for a new trial in Federal Rule of Criminal Procedure 33); *Kontrick v. Ryan*, 540 U.S. 443, 446–47 (2004) (time limit to object to the debtor's discharge in Federal Rule of Bankruptcy Procedure 4004).

These recent decisions rest on the principle that "[o]nly Congress may

17

determine a lower federal court's subject-matter jurisdiction." *Kontrick*, 540 U.S. at 452 (citing U.S. Const. art. III, § 1); *see also Hamer*, 138 S. Ct. at 17 ("[A] provision governing the time to appeal in a civil action qualifies as jurisdictional only if Congress sets the time."). That principle calls the precedents treating the requirements of Rule 3(c) as jurisdictional into doubt. *See, e.g.*, *Torres*, 487 U.S. at 317; *C. A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1056 (5th Cir. 1981). After all, the requirements that a notice of appeal "specify the party or parties taking the appeal," Fed. R. App. P. 3(c)(1)(A), and "designate the judgment, order, or part thereof being appealed," *id.* 3(c)(1)(B), appear only in a court rule, not a statute. But we are bound to follow *Torres* and later precedents on this issue until the Supreme Court overrules them. *See Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1263 (11th Cir. 2012).

Although Supreme Court precedent requires us to treat the content requirements of Rule 3(c) as jurisdictional, we would still have to decide whether the body shops complied with them even if Rule 3(c) provided only mandatory claim-processing rules. Several of the insurance companies in the Mississippi appeal raised the body shops' failure to designate the order dismissing their antitrust claims in their opening briefs. "If properly invoked, mandatory claim-processing rules *must* be enforced." *Hamer*, 138 S. Ct. at 17 (emphasis added). So we would enforce Rule 3(c) here, at least with respect to the insurance companies

18

that raised it, even if it were a nonjurisdictional claim-processing rule.

To determine whether the Mississippi body shops complied with the requirement that a notice of appeal "designate the judgment, order, or part thereof being appealed," Fed. R. App. P. 3(c)(1)(B), we must resolve an intracircuit split of authority. One line of precedent holds that a notice of appeal that designates the final judgment allows us to review "all prior non-final orders and rulings which produced the judgment." *Barfield v. Brierton*, 883 F.2d 923, 930 (11th Cir. 1989); *see also Kong v. Allied Prof'l Ins. Co.*, 750 F.3d 1295, 1301 (11th Cir. 2014). Under *Barfield*, if the notice of appeal designates the final, appealable judgment, *see* 28 U.S.C. § 1291, we may review any undesignated interlocutory orders that produced the judgment without further inquiry into whether the appellant intended to appeal those orders. *Barfield*, 883 F.2d at 930; *see also Kong*, 750 F.3d at 1301 (applying the rule of *Barfield* without conducting an intent inquiry); *Toomey v. Wachovia Ins. Servs., Inc.*, 450 F.3d 1225, 1228 n.2 (11th Cir. 2006) (same); *Club Car, Inc. v. Club Car (Quebec) Imp., Inc.*, 362 F.3d 775, 785 & n.5 (11th Cir. 2004) (same), *abrogated on other grounds by Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames*, 620 S.E.2d 352 (Ga. 2005), *as recognized in Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1258–59 & n.7 (11th Cir. 2010). But under a later line of precedent, we lack jurisdiction to review undesignated interlocutory orders if the appellant's intent to appeal those

19

orders is unclear—even if the notice of appeal designates the final, appealable judgment. *Seminole Tribe of Fla. v. Stranburg*, 799 F.3d 1324, 1343–44 (11th Cir. 2015); *White v. State Farm Fire & Cas. Co.*, 664 F.3d 860, 863–64 (11th Cir. 2011); *Moton v. Cowart*, 631 F.3d 1337, 1340 n.2 (11th Cir. 2011); *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1079–80 (11th Cir. 2003). In those decisions, we looked to the face of the notice of appeal or the appellant's initial brief to determine the appellant's intent and concluded that an intent to appeal the undesignated orders was lacking, so we lacked jurisdiction. *Seminole Tribe*, 799 F.3d at 1343–44; *White*, 664 F.3d at 864; *Moton*, 631 F.3d at 1340 n.2; *Whetstone Candy*, 351 F.3d at 1079–80.

The later precedents—*Seminole Tribe*, *White*, *Moton*, and *Whetstone Candy*—did not mention our earlier precedent *Barfield*, which reviewed an undesignated interlocutory order because the notice of appeal designated the final judgment. Instead, the later precedents cited two other decisions decided before *Barfield*. The pre-*Barfield* decisions held that we lacked jurisdiction to review one *part* of an order designated in the notice of appeal because the notice specifically identified one or more other parts of the same order as the subject of the appeal. *See Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1374 (11th Cir. 1983) ("[T]he notice specifically stated that the appeal was only 'from those portions' of the order that dealt with issues raised in the summary judgment motions."); *C. A. May*

*Marine Supply*, 649 F.2d at 1055 ("The notice of appeal expressly refers to that portion of the order denying the appellant's motion for a new trial."). In both decisions, we explained that the appellant's intent to appeal the unmentioned portions of the designated order was unclear, so we lacked jurisdiction to review those portions. *Pitney Bowes*, 701 F.2d at 1374; *C. A. May Marine Supply*, 649 F.2d at 1056. In contrast, *Seminole Tribe*, *White*, *Moton*, and *Whetstone Candy* decided whether the appellants clearly intended to appeal the undesignated interlocutory orders—not unmentioned portions of a designated order. *Seminole Tribe*, 799 F.3d at 1343–44; *White*, 664 F.3d at 863–64; *Moton*, 631 F.3d at 1340 n.2; *Whetstone Candy*, 351 F.3d at 1079–80.

When faced with an intracircuit conflict, we must follow our earliest precedent, *CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1338 (11th Cir. 2017), which means we must follow *Barfield* instead of *Seminole Tribe*, *White*, *Moton*, and *Whetstone Candy*, *see id.* at 1340. The pre-*Barfield* decisions that our later precedents cited—*Pitney Bowes* and *C. A. May Marine Supply*—provided no basis to depart from the holding of *Barfield* that designation of the final, appealable order allows us to review any earlier interlocutory orders that produced the judgment. *Barfield* is consistent with the holdings of *Pitney Bowes* and *C. A. May Marine Supply*, which control when a notice of appeal designates a specific part of an order for appeal and leaves undesignated other parts of the same order. *See*

21

*Pitney Bowes*, 701 F.2d at 1374; *C. A. May Marine Supply*, 649 F.2d at 1056.

Indeed, *Barfield* itself acknowledged this distinction. 883 F.2d at 930 (explaining

that the rule of *C. A. May Marine Supply* applies when an order decides multiple

"separate issues" and the notice of appeal expressly designates "one part of [that]

order," but not when an appellant "seeks review of the entire final judgment"). And

because our later precedents failed to mention *Barfield*, they also failed to

acknowledge that *Barfield* made this distinction.

Following our earlier precedent, we hold that when a notice of appeal

designates the final, appealable order—and does not identify specific parts of that

order for appeal—we have jurisdiction to review that order and any earlier

interlocutory orders that produced the judgment. In their notice of appeal, the

Mississippi body shops designated the final, appealable order that dismissed their

remaining claims under state law. The order was "final," 28 U.S.C. § 1291,

because it was the order "by which [the] district court disassociate[d] itself from

the case." *Drummond Co. v. Terrance P. Collingsworth, Conrad & Scherer, LLP*,

816 F.3d 1319, 1322 (11th Cir. 2016) (internal quotation marks omitted). In that

order, the district court dismissed the body shops' remaining state claims with

prejudice and directed the Clerk "to close the file." The order "end[ed] the

litigation on the merits and [left] nothing more for the court to do but execute the

judgment." *Id.* (internal quotation marks omitted). So we can review the

undesignated interlocutory order that dismissed their antitrust claims because that order was a "step[] towards [the] final judgment into which [it] merge[d]." *Barfield*, 883 F.2d at 931 (internal quotation marks omitted).

Except for *Seminole Tribe*, *White*, *Moton*, and *Whetstone Candy*, this rule accords with our precedent. We have often reviewed undesignated interlocutory orders where the notice of appeal designated the final judgment, although we have sometimes engaged in unnecessary inquiries about the appellant's intent or prejudice to the appellee. *See Davila v. Gladden*, 777 F.3d 1198, 1203, 1208 n.5 (11th Cir. 2015); *Kong*, 750 F.3d at 1301; *KH Outdoor, LLC v. City of Trussville*, 465 F.3d 1256, 1258–60 (11th Cir. 2006); *Toomey*, 450 F.3d at 1228 n.2; *Club Car*, 362 F.3d at 785 & n.5; *Barfield*, 883 F.2d at 930; *Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1376, 1390 & n.15 (5th Cir. 1979). And this rule continues to acknowledge that a notice of appeal that identifies a specific part of a designated order for appeal does not confer jurisdiction to review unmentioned parts of the order. *See Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1290 n.12 (11th Cir. 2002); *Pitney Bowes*, 701 F.2d at 1374; *C. A. May Marine Supply*, 649 F.2d at 1056.

Although we stated in a pre-*Barfield* decision that "we will not expand [a notice of appeal] to include . . . orders not specified unless the overriding intent to appeal these orders is readily apparent on the face of the notice," *Osterneck v. E.T.*

23

*Barwick Indus., Inc.*, 825 F.2d 1521, 1528–29 (11th Cir. 1987), that statement is dicta and does not bind us. The issue in *Osterneck* was the effect of naming some but not all of the appellees in a notice of appeal, not the effect of failing to designate an interlocutory order. *Id.* at 1528–29. Our statement about undesignated orders in *Osterneck* was not necessary to the decision we reached, so it is not part of our holding. *See Fresh Results, LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1049 (11th Cir. 2019) ("[R]egardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." (internal quotation marks omitted)). We are bound by the holding of *Barfield* that designation of the final judgment allows us to review "all prior non-final orders and rulings which produced the judgment." 883 F.2d at 930.

### C. The District Court Correctly Dismissed the Mississippi Body Shops' Antitrust Claims.

The Mississippi body shops assert two antitrust claims against the insurance companies. They allege that the insurance companies engaged in a horizontal price-fixing conspiracy and a group boycott in violation of the Sherman Act, 15 U.S.C. § 1. We conclude that the district court correctly dismissed these claims.

We recently decided en banc several appeals by other body shops that raised similar claims of horizontal price-fixing and group boycott. *See Quality Auto*, 917 F.3d at 1262–72. Here, as in *Quality Auto*, the body shops allege that the insurance companies conspired to fix the prices they will pay for repairs the shops perform

24

for their insureds. The body shops also allege that the insurance companies conspired to boycott shops that fail to comply with their pricing demands by collectively steering insureds away from noncompliant body shops. In *Quality Auto*, we held that the body shops' allegations were insufficient to state claims of horizontal price-fixing or group boycott. *Id.* at 1262–72. The factual allegations of the Mississippi complaint are very similar to the allegations we held insufficient in *Quality Auto*, but they differ in some respects. For that reason, we consider in this appeal only those allegations that materially differ from the allegations we held insufficient in *Quality Auto*.

To state a claim of horizontal price-fixing or group boycott, the body shops must allege, among other elements, facts that plausibly suggest "an agreement or conspiracy among the Insurance Companies." *Id.* at 1262; *see also id.* at 1260. Under this standard, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (alterations adopted) (internal quotation marks omitted). Allegations of parallel conduct, even conscious parallelism, are insufficient standing alone to raise an inference of conspiracy. *Quality Auto*, 917 F.3d at 1261–62. Where a conspiracy claim rests on allegations of parallel conduct, a plaintiff must allege sufficient "plus factors" to make the parallel conduct "more probative of conspiracy than of conscious

25

parallelism." *Id.* at 1262 (internal quotation marks omitted).

We begin with the body shops' allegations of price-fixing. In their brief, the Mississippi body shops identify three allegations from their complaint relevant to their price-fixing claim that materially differ from the allegations in *Quality Auto*. We review each of the allegations and conclude that none of them plausibly suggests a prior agreement to fix prices.

First, the body shops allege that "in Oklahoma, Chad Turner of USAA told Blevins Paint and Body that labor rates would be going up shortly because the new State Farm survey results had just been sent out and it would take USAA a couple of weeks to put them in motion." To begin, this allegation is irrelevant to the Mississippi body shops' claims because it pertains to the actions of insurance companies in Oklahoma. The Mississippi complaint contains no allegation that State Farm shares its "market rate" surveys for Mississippi with other insurance companies. Instead, the complaint alleges only that the other insurance companies tell the body shops that "they will pay no more than State Farm pays for labor." And we have already held that this allegation of "price leadership"—"[f]ollowing the example set by a competitor, without agreeing to do so in advance"—"is insufficient to establish the existence of an agreement." *Id.* at 1264 (internal quotation marks omitted).

Even if this allegation were relevant to the Mississippi action, it does not

26

plausibly suggest a price-fixing conspiracy instead of price leadership. The allegation does not say *to whom* the State Farm survey results were "sent out"— they could have been sent either to the body shops with whom State Farm does business *or* to other insurance companies. The first interpretation is entirely consistent with lawful price leadership: State Farm sends out its new labor rates to the body shops with whom it deals, and USAA independently matches those prices in short order. This allegation is not enough to "make[] collusion more plausible than conscious parallelism." *Id.* at 1263.

Second, the body shops allege that when State Farm alters its "market rate" for labor, the other insurance companies match State Farm's new rate within a period of weeks. But this allegation again suggests only price leadership, not a prior agreement to fix prices. *See id.* at 1264. Although the body shops allege that State Farm does not publicly disclose its market rate, we explained in *Quality Auto* that failing to publicly disclose the market rate and keeping the market rate *secret*, which could make uniform pricing suggestive of a conspiracy, "are two very different things." *Id.* "[T]hat State Farm does not issue a press release with the market rate does not foreclose the possibility that it is publicly known." *Id.* And as in *Quality Auto*, the Mississippi complaint makes clear "that State Farm must necessarily tell the rate to every repair shop in a given geographic area" when it reimburses the shops at that rate. *Id.*

27

Third, the body shops allege that many of the insurance companies have offered the same false reasons for refusing to pay the body shops' posted labor rates and have used the same threatening tactics to discourage the body shops from discussing their rates with each other. Several insurance companies have told individual shops that "they are the only shop[s] trying to raise their rates," and that they will not honor the shops' posted rates for that reason. Insurance companies have also told individual body shops that "if they discuss labor rates with each other, they will be price fixing and breaking the law."

These allegations of uniform tactics do not plausibly suggest a conspiracy because there is no reason to believe these practices are "somehow idiosyncratic and not to be expected as within the 'wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'" *Id.* at 1266 (quoting *Twombly*, 550 U.S. at 554). The use of common tactics by competitors suggests a conspiracy "only if such usage would not plausibly arise from 'independent responses to common stimuli.'" *Id.* at 1267 (quoting *Twombly*, 550 U.S. at 556 n.4). Here, as in *Quality Auto*, it is just as plausible that the insurance companies independently use these similar tactics to avoid paying higher prices for repairs as it is that the insurance companies' tactics are the result of a prior agreement. *See id.* The body shops' allegations of uniform tactics do not raise a plausible inference of conspiracy.

28

In addition to their allegations about price-fixing, the Mississippi body shops also identify two allegations relevant to their boycott claim that were not present in *Quality Auto*. To review, the essence of the boycott claim is that the insurance companies agreed to steer customers away from any body shops that left their direct repair programs or otherwise refused to conform to their pricing demands. *See id.* at 1271 (explaining that a group boycott includes "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target" (quoting *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978))). As with their price-fixing claim, the body shops' boycott claim "requires as a prerequisite sufficient allegations of an agreement or conspiracy." *Id.* We conclude that neither allegation on which the shops rely plausibly suggests a conspiracy to boycott.

The body shops first allege that the insurance companies use uniform tactics to steer their insureds away from body shops that refuse to pay State Farm's labor rates. In *Quality Auto*, the body shops argued that the insurance companies steered their insureds away from noncompliant shops using "the same script containing identical false and misleading steering statements," which could have plausibly suggested a prior agreement to steer. *Id.* at 1271 (internal quotation marks omitted). But we explained that the complaints did not contain any such allegation: "both the word 'script' and the word 'identical' [were] conspicuously absent from

29

the complaints." *Id.* Here, the Mississippi complaint is again devoid of any allegations about a "script" of identical steering statements. But it does allege that "[r]egardless of which insurer is involved," the insurance companies ordinarily use "the same list of false or misleading" statements to steer consumers away from noncompliant shops. The complaint then offers a nonexhaustive list of "[e]xamples of these statements." The statements include telling insureds that the shop they have selected is not on the insurer's preferred list, has had quality issues, charges more, or takes longer to complete repairs than other shops.

These allegations of uniform steering tactics do not plausibly suggest a conspiracy. As we explained in *Quality Auto*, the steering tactics the body shops allege "could hardly be . . . more expected or more commonly used" methods to discourage insureds from patronizing a disfavored shop. *Id.* at 1272. They "are not so idiosyncratic that they suggest conspiracy." *Id.* Telling an insured that a shop is not a preferred provider, does poor work, charges more, or takes longer than other shops "are methods that would logically be employed by any insurer to dissuade its insureds from using a disfavored shop." *Id.* These allegations of uniform conduct "fall well within the 'wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'" *Id.* (quoting *Twombly*, 550 U.S. at 554).

In addition to uniform steering tactics, three of the Mississippi body shops

30

allege that shortly after leaving the State Farm and Shelter direct repair programs, they experienced a substantial drop in business from customers insured by other insurance companies. Clinton Body Shop lost about 50 percent of its customers from Mississippi Farm Bureau, 30 percent from Nationwide, and 20 percent from Progressive. Clinton Body Shop of Richland lost 20 percent of its customers from Geico, 10 percent from Safeco, 50 percent from Nationwide, 50 percent from USAA, and 15 percent from Progressive. And after leaving Shelter's direct repair program, Bill Fowler's Bodyworks lost 30 percent of its customers from Mississippi Farm Bureau, 60 percent from State Farm, 75 percent from Allstate, and 30 percent from Progressive.

The body shops attribute this loss in business to a concerted effort among the insurance companies to steer customers away from their shops as punishment for leaving the direct repair programs. But unlike in other parts of their complaint, the shops allege no specific instances of steering by other insurance companies after leaving a different insurer's program. They instead ask us to infer concerted steering from the loss in business.

These allegations of lost business do not plausibly suggest that the insurance companies engaged in steering, let alone concerted steering. The body shops offer no allegations that explain why the loss in business they allege is plausibly explained by steering instead of other "obvious alternative explanation[s]."

31

*Twombly*, 550 U.S. at 567. They instead invite us to speculate that steering caused this loss in business. But we are not permitted to engage in speculation, even at the pleading stage. *See id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Instead of steering, the loss in business could just as plausibly be explained by any number of legitimate market forces. Those forces include competition from other shops, decreased demand for vehicle repairs in the relevant time period, a greater demand for repairs in the preceding year, or fluctuations in consumer choice about where to have vehicles repaired. The wildly varying amounts of lost business—from 10 percent to 75 percent depending on the insurer and the shop— undermines concerted steering as a plausible explanation. And most importantly, the complaint provides no reason to believe that the amount of revenue each shop receives from each insurance company remains roughly constant from year to year under normal circumstances. In a market for car repairs, which depends on unpredictable events like car crashes, it would be unsurprising if considerable fluctuations in business were the norm. Absent any allegations about the usual volume of business these three shops receive from each insurer, we cannot infer that steering, as opposed to fluctuations in demand and consumer choice, plausibly caused the drop in business.

Another problem with these allegations is that the complaint provides no

32

information about how the body shops calculated the percentages of lost business they allege, and the percentages tell us little on their own. Among other gaps, we do not know what time frame the body shops used to arrive at these percentages. Did they compare the number of customers from each insurance company in the *month* before and after they left the direct repair programs or the *year* before and after they left the programs? The smaller the time frame, the more likely it is that fluctuations in demand or consumer choice account for the loss. Again, we are left to speculate. Relatedly, we have no idea how many total customers from each of the other insurance companies these three shops served before they left the State Farm and Shelter programs. Although the body shops collectively allege that 75 to 95 percent of their annual revenues come from insurance companies and that the named insurance companies collectively enjoy a 75 percent market share in Mississippi, there is likely substantial variation in the number of customers individual shops receive from any one insurance company. For all we know, these three shops could have each had a dozen or a thousand Progressive customers. And losing even a large percentage of a small number of customers would not be probative of steering as opposed to fluctuations in demand or consumer choice.

Without more information to place these threadbare allegations of lost business in context, we would have to engage in impermissible speculation to conclude that concerted steering plausibly caused the decrease in business. *See id.*

33

The allegations of lost business are "consistent with" concerted steering, but "they do not plausibly establish" steering because of the many other "more likely explanations." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). The district court correctly dismissed the antitrust claims.

### D. The District Court Did Not Abuse Its Discretion When It Denied the Mississippi Body Shops' Motion for Reconsideration.

The Mississippi body shops argue the district court abused its discretion when it denied their motion to reconsider its dismissal of their antitrust claims based on newly discovered evidence. The district court denied the motion because the body shops failed to establish that this new evidence was previously unavailable. We agree with the insurance companies that the district court did not abuse its discretion.

The body shops based their motion to reconsider on newly discovered "direct evidence of price fixing." The body shops explained that, sometime after filing their second amended complaint, they "obtained a statement from a Progressive employee who stated unequivocally that body shops have no say in the setting of their own labor rates, that the insurance companies 'get together at big meetings' to set body shop labor rates, and that the insurance companies uniformly apply the labor rates agreed upon at these meetings." The body shops also alleged that they "obtained a statement from a State Farm representative who stated State Farm intentionally suppresses and fixes body shop labor rates, and that State

34

Farm's labor rate survey is a sham to justify its intentional fixing of labor rates." They moved the district court to reconsider its order of dismissal and allow them "to amend their complaint to include these direct admissions of price fixing."

The district court construed the "motion to reconsider" as a motion to alter or amend the judgment, Fed. R. Civ. P. 59(e), which it denied. The district court correctly explained that when a Rule 59(e) motion is based on new evidence, the movant must "show that the evidence was previously unavailable." *Mays v. U.S. Postal Serv.*, 122 F.3d 43, 46 (11th Cir. 1997). And it ruled that the body shops had not established that their new evidence was previously unavailable. Although the body shops asserted that the new evidence was unavailable when they *filed* their second amended complaints, those complaints were pending for nearly a year before the district court dismissed their antitrust claims. And the body shops "offer[ed] no explanation for their failure to bring this information before the [district court] during that time."

The district court did not abuse its discretion when it denied the motion to reconsider. *See M.G. v. St. Lucie Cty. Sch. Bd.*, 741 F.3d 1260, 1262 (11th Cir. 2014) ("Where a party attempts to introduce previously unsubmitted evidence on a motion to reconsider, the court should not grant the motion absent some showing that the evidence was not available during the pendency of the case." (alterations adopted) (quoting *Mays*, 122 F.3d at 46)). Indeed, the Mississippi body shops do

35

not even challenge the ruling that they failed to establish the new evidence was previously unavailable, so they cannot obtain reversal of that ruling. *See Broward Bulldog, Inc. v. U.S. Dep't of Justice*, 939 F.3d 1164, 1181 (11th Cir. 2019).

### E.  The District Court Correctly Dismissed Most of the Mississippi Body Shops' Claims Under State Law.

The Mississippi body shops bring several claims under state law against the insurance companies. They assert claims of quantum meruit and tortious interference with business relationships, and they allege that the insurance companies violated a state statute, Miss. Code Ann. § 83-11-501. Although the district court correctly dismissed most of these claims, we conclude that two of the shops have adequately alleged claims of tortious interference against the Progressive defendants.

The claims of quantum meruit fail for the same reason those claims failed in *Quality Auto*: the body shops fail to allege an essential element of that claim. 917 F.3d at 1273. To state a claim for quantum meruit, the body shops must allege, among other elements, that they rendered services in circumstances that would reasonably notify the insurance companies that they expected payment for the services. *See In re Estate of Fitzner*, 881 So. 2d 164, 173–74 (Miss. 2003). The body shops do not allege that the insurance companies never paid for their services; instead, they base their claims of quantum meruit on the insurance companies' failure to pay *enough* for their services. But the body shops' own

36

allegations establish that the circumstances could not have reasonably notified the insurance companies that the body shops expected additional compensation. The body shops allege that the insurance companies *tell them* that they will pay no more for repairs than the "market rate" determined by State Farm. Indeed, they allege that the insurance companies present their payment terms on a "take it or leave it" basis. As in *Quality Auto*, those allegations are fatal to the body shops' claims of quantum meruit. "Having fully informed the Body Shops of what they were willing to pay, the circumstances could have only reasonably informed the Insurance Companies that the Body Shops expected to be paid the amount State Farm would pay." *Quality Auto*, 917 F.3d at 1273.

The body shops' statutory claims, Miss. Code Ann. § 83-11-501, also fail. The statute prohibits an insurer from conditioning payment for repairs on those repairs being made by a particular shop:

> No insurer may require as a condition of payment of a claim that repairs to a damaged vehicle . . . must be made by a particular contractor or motor vehicle repair shop; provided, however, the most an insurer shall be required to pay for the repair of the vehicle . . . is the lowest amount that such vehicle . . . could be properly and fairly repaired or replaced by a contractor or repair shop within a reasonable geographical or trade area of the insured.

*Id.* But the body shops argue that this statute imposes a duty on insurers to "pay for a proper and fair repair" and that the insurance companies have breached that duty by refusing to pay for necessary repairs at the body shops' posted prices. We

37

disagree.

The statute imposes no duty on insurers to pay a certain amount for repairs. Instead, the statute imposes two other requirements: it forbids insurers to "condition . . . payment of a claim" on repairs being performed at a particular body shop, *id.*; and it sets a ceiling on the amount an insurer *must* pay to repair a vehicle: "the most an insurer shall be required to pay" for repairs is "the lowest amount" for which the vehicle "could be properly and fairly repaired" by a body shop within a reasonable distance of the insured, *id.* So there is only one way an insurance company can violate the statute: by conditioning payment of a claim on repairs being made by a particular shop. The body shops have not alleged any such conduct by the insurance companies, so they have not alleged that the insurance companies violated the statute. The district court correctly dismissed the statutory claims.

Most of the claims of tortious interference fail for one of three reasons. First, the group allegations of tortious interference fail to give the individual insurance companies fair notice of the claims against them, so they violate the shotgun-pleading doctrine. Second, many of the body shops fail to allege that the insurance companies' actions damaged their businesses. And third, some of the body shops fail to allege that the insurance companies acted with malice. But two of the body shops have adequately alleged a claim of tortious interference against the

38

Progressive defendants.

We first address the body shops' group allegations of tortious interference. The body shops allege that the insurance companies interfered with their businesses by wrongfully "steering" prospective customers away from noncompliant body shops to competitors that complied with their pricing demands and other requirements. Some portions of the complaint detail the specific instances of steering about which the body shops complain. But the complaint also alleges, more generally, that "[t]he Defendants" have wrongfully steered customers away from "the Plaintiffs" through "their repeated campaign of misrepresentation of facts." The insurance companies argue that these group allegations cannot state a claim for relief because they fail to give them fair notice of the body shops' claims and the facts on which they are based. We agree.

A complaint constitutes an impermissible shotgun pleading if it "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). The problem with this kind of pleading is that it fails "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* Pleadings of this nature violate the requirement that a plaintiff provide "a short and plain statement of the claim," Fed.

39

R. Civ. P. 8(a)(2). *Weiland*, 792 F.3d at 1320–22; *see also Twombly*, 550 U.S. at 555 (explaining that Rule 8(a)(2) exists to "give the defendant fair notice of what the claim is and the grounds upon which it rests" (alteration adopted) (internal quotation marks omitted)). Although we have sometimes vacated dismissals of shotgun complaints and remanded with instructions to allow the plaintiff to replead, *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001), we have also held that a district court is required to give a counseled plaintiff only one chance to replead before dismissing a complaint with prejudice on shotgun-pleading grounds, *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018).

The group allegations of tortious interference constitute shotgun pleading because they fail to give any defendant fair notice of the allegations against it. The Mississippi complaint names 28 body shops from across the state as plaintiffs. And counting the named insurance companies in the same corporate family as a single defendant, the complaint names 11 defendants. The allegation that "[t]he Defendants" steered customers away from "the Plaintiffs" makes it impossible for any individual insurance company to determine which of the 28 body shops it is alleged to have harmed through tortious interference. This allegation, standing alone, fails to give the insurance companies "adequate notice" of the grounds upon which the various body shops' claims of tortious interference rest. *Weiland*, 792 F.3d at 1323; *see also Magluta*, 256 F.3d at 1284 (condemning as a shotgun

40

pleading a complaint that was "replete with allegations that 'the defendants' engaged in certain conduct" and made "no distinction among the fourteen defendants charged, though geographic and temporal realities make plain that all of the defendants could not have participated in every act complained of"). The body shops cannot rely on their group allegations of steering to state claims of tortious interference against all the insurance companies. And because the district court gave the body shops an opportunity to cure the group allegations by amending their complaint, it permissibly dismissed with prejudice the claims of tortious interference that were based on the group allegations. *See Vibe Micro*, 878 F.3d at 1296.

Our decision in *Quality Auto*, which held that similar allegations of tortious interference did not constitute shotgun pleading, is not to the contrary. 917 F.3d at 1274–76. Four of the complaints in *Quality Auto* named "only one plaintiff," and the fifth complaint named only "four body shops located in close proximity to each other" as plaintiffs. *Id.* at 1275. We explained that it was "absolutely clear" from the complaints that the victims of the tortious interference were the lone body shop in the first four complaints and *each* of the four body shops named in the fifth complaint, and that each defendant was alleged to have interfered with each plaintiff. *Id.* But here, it is unclear that each of the named insurance companies is alleged to have successfully steered customers away from each of 28 Mississippi

41

body shops.

The failure to specify which particular defendants certain allegations relate to is not fatal when "[t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct," *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000), but we cannot fairly read the body shops' complaint in that manner. The specific instances of steering that the body shops describe in their complaint provide reason to doubt that each of the insurance companies has harmed each of the body shops through steering. As discussed below, these allegations make clear that many of the alleged steering attempts were unsuccessful, which prevents those body shops from establishing the element of damages. We cannot fairly read the complaint to allege that each of the insurance companies damaged each of the body shops by successfully diverting prospective customers to other shops. For that reason, the group allegations fail to state a claim for tortious interference.

Apart from the group allegations, the Mississippi complaint alleges 15 instances of steering by particular insurance companies against individual body shops. To state claims of tortious interference, these body shops must allege that the insurance companies (1) intentionally and willfully acted (2) to harm the body shops' businesses, (3) "with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the [insurance companies] (which

42

constitutes malice)" and (4) caused actual damage to the shops. *See Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 16 (Miss. 2007). Most of the alleged instances of steering fail to state a claim because the body shops do not allege that they suffered damage or that the insurance companies acted with malice. But two of the body shops have adequately alleged tortious interference.

Ten of the alleged instances of steering fail to state a claim because the insurance companies did not damage the body shops. As the body shops admit, many of the "[e]xamples of steering" in their complaint are examples of "failed" steering—instances in which the insurance company was unsuccessful in its attempt to influence its insured to use a different body shop. Of the 15 instances of steering, the body shops allege only five in which the steering actually caused the customer to choose a different shop. Because they failed to allege actual damage, *Biglane*, 949 So. 2d at 16, the other 10 allegations of unsuccessful steering attempts cannot state a claim for tortious interference.

Of the five successful instances of steering, three fail to state a claim because the body shops do not allege that the insurance companies acted with malice. Proof of malice requires evidence that the defendant acted "with a malicious intent to interfere and injure the business of another," *Cenac v. Murry*, 609 So. 2d 1257, 1271 (Miss. 1992), and "without right or justifiable cause," *Biglane*, 949 So. 2d at 16. These two aspects of malice are distinct; a party can act

43

with the malicious intent to injure another but not engage in tortious interference if he acts with right or justifiable cause. *See id.* (holding that a landowner who spitefully blocked a parking area used by a neighboring business did not act "without right or justifiable cause" because he owned the parking area). The body shops' allegations founder on the "without right or justifiable cause" aspect of malice.

Alexander Body Shop alleges that it lost two prospective customers because State Farm required those customers to take their vehicles to one of State Farm's approved shops for an estimate before taking the vehicles to their shop of choice for repairs. The two customers eventually let the approved shops repair their vehicles to avoid the inconvenience of moving their vehicles to Alexander after the estimate. These allegations do not establish that State Farm acted without right or justifiable cause. Although the body shops aver that State Farm's "insistence" that the customers use its approved shops for estimates is "illegal," they cite no authority to support their assertion. Mississippi law forbids insurers to condition payment of a claim upon "*repairs* to a damaged vehicle . . . be[ing] made by a particular . . . shop," but it does not forbid them to require customers to use their approved shops to obtain *estimates*. Miss. Code Ann. § 83-11-501 (emphasis added). Alexander has failed to allege that State Farm acted "without right or justifiable cause" as to these two instances of steering. *Biglane*, 949 So. 2d at 16.

44

Lakeshore Body Shop alleges that it lost a prospective customer because State Farm told her she "would have to pay herself for charges State Farm 'did not deem reasonable'" if she used Lakeshore for repairs instead of an approved shop. The problem with this allegation is that Lakeshore does not allege that State Farm's statement to the customer was false or misleading in any way. And if the statement was not false or misleading, we can hardly say that State Farm acted "without right or justifiable cause." *Biglane*, 949 So. 2d at 16; *cf. Cenac*, 609 So. 2d at 1271 (explaining that tortious interference encompasses using "misrepresentation[s]" to interfere with business prospects). There is nothing tortious about an insurance company truthfully informing its insureds of the consequences of choosing one body shop for repairs over another. Although the body shops make conclusory allegations in other parts of the complaint that the insurance companies "generally" and "ordinarily" use "false or misleading information" to steer their insureds away from noncompliant body shops, they fail to allege that State Farm's statement here was misleading in any way.

Finally, two Mississippi body shops have adequately alleged claims of tortious interference against the Progressive defendants based on two successful instances of steering. AutoWorks Collision Specialist and Walkers Collision Center allege that they each lost one customer because Progressive misleadingly told the customers that it would guarantee the repair work if they used

45

Progressive's preferred shops, but not if they used Autoworks or Walkers. According to Autoworks and Walkers, the insurance companies never "guarantee" repair work themselves; at most, they require their preferred shops to guarantee their own work. But the preferred shops often do not live up to these "hypothetical" guarantees, and the insurers' statements "mislead . . . potential customers into assuming [that Autoworks and Walkers] do not guarantee their own work." AutoWorks and Walkers also allege that Progressive's steering is designed only to harm them and not to serve any legitimate business interest of Progressive, which pays the same amount for repairs whether they are performed by a preferred or non-preferred shop. In either case, Progressive pays "only what it [chooses] to pay regardless of the actual cost of repairs." We agree with the body shops that AutoWorks and Walkers have plausibly alleged that Progressive intentionally damaged their businesses with the malicious intent to injure them and without right or justifiable cause. *See Biglane*, 949 So. 2d at 16.

## IV. CONCLUSION

We **VACATE** the orders dismissing the second amended complaints and denying the body shops' motions to reconsider in the Indiana and Utah actions. We **AFFIRM** the dismissal of the Mississippi body shops' antitrust claims and the denial of their motion for reconsideration. We also **AFFIRM** the dismissal of their claims under state law, except for the two claims of tortious interference by

46

AutoWorks Collision Specialist and Walkers Collision Center against the Progressive defendants. We **VACATE** the parts of the orders that dismissed those two claims of tortious interference and **REMAND** for further proceedings.