C. A. MAY MARINE SUPPLY COMPA-
NY, Plaintiff-Appellant,

v.

BRUNSWICK CORPORATION,
Defendant-Appellee.

No. 79–1543.

United States Court of Appeals,
Fifth Circuit.

July 6, 1981.

Rehearing Denied July 29, 1981.

John C. Butters, Atlanta, Ga., for plaintiff-appellant.

Alston, Miller & Gaines, Ronald L. Reid, Atlanta, Ga., for defendant-appellee.

Before HENDERSON, POLITZ and WILLIAMS, Circuit Judges.

PER CURIAM:

The appellant, C.A. May Marine Supply Company (May Marine), challenges the sufficiency of the damages awarded in its action against the appellee, Brunswick Corporation (Mercury), for the wrongful termination of its franchise as a Mercury motois dealer. May Marine also raises several errors allegedly occurring in the trial on damages as well as the trial court's disallowance of attorney's fees. To put these allegations in context, we briefly review the facts.

May Marine offers a full line of boats, trailers, sailboats, canoes, parts and accesso-

ries and operates a shop for repairing marine equipment in the Atlanta metropolitan area. Since 1966 Mercury outboard motors were one of its many lines of merchandise. May Marine's right to sell Mercury motors was governed by a series of direct sales contracts. Each of the one-year agreements gave either party the right to terminate on thirty days notice and specifically provided that Mercury was under no duty to enter into a new contract for the following year. The parties agreed that the contractual obligations were to be "interpreted and construed according to the laws of the State of Wisconsin". The Wisconsin Fair Dealership Law provided that the grantor of a dealership must give the dealer 90 days notice of its intent not to renew and 60 days to rectify claimed deficiencies.[1]

Chester A. May, Jr. was the president and main shareholder of May Marine. His wife was the only other stockholder and officer in the corporation. Although he had been in the marine supply business for approximately 20 years, May had expressed concern about the future of the outboard motor business because of the 1974 oil shortage. A few weeks before he received notice that his dealership would not be renewed, May stated that within five years he intended to sell only accessories and that he was going to "pull in his horns" and reduce both advertising and inventory.

On August 11, 1975, Mercury notified May Marine that it did not intend to enter into a new sales contract after the termination of the existing contract on August 31, 1975. Although Mercury complied with the express termination provisions of the direct sales contract, the cancellation was in apparent contravention of the Wisconsin dealership statute. May Marine filed an action on January 22, 1976 for injunctive relief and damages resulting from Mercury's alleged violation of the Wisconsin Fair Dealership Law in failing to renew May Marine as a Mercury outboard motor dealer. In its answer, Mercury contended that the Wisconsin law did not apply to the contract.

On June 30, 1976, the district court granted May Marine's motion for summary judgment on the question of liability, holding that Mercury's nonrenewal of May Marine's dealership was in violation of the Wisconsin law.[2] In the *per curiam* opinion, this court affirmed the order of summary judgment in favor of May Marine. Only the issue of damages remained for trial.

At the trial on damages, the jury was required to determine whether May Marine had suffered injury by virtue of Mercury's breach of the contract, the extent of the damage, if any, and the sufficiency of May Marine's efforts to mitigate its losses. Much of the testimony centered on the measure of damages. Evidence was presented as to both the impairment of the business' value overall and the loss of profits. May Marine's expert witness on damages testified that the business' value before August 31, 1975, was $153,468.00, that immediately after the notice of nonrenewal the value was reduced to $58,898.00 and that as of the trial date the business' value had declined to $9,989.00. In contrast, the defendant's expert witness stated that the business was worth $66,000.00 on August 31, 1975.

As far as lost profits were concerned, May could not state what percentage of his sales were attributable to outboard motors. However, the evidence revealed that while it carried the Mercury line, May Marine's average before tax earnings for the five years prior to termination was $6,910.00, $8,875.00 for the three years prior to nonrenewal, and for the last year a sales loss of $4,506.00 and a net income before taxes of $1,970.00. Neither the change in value nor earnings attributable to loss of the motor dealership could be isolated.

Not until the trial did the judge make a determination of the measure of damages. On September 22, 1978 and prior to trial, May Marine deposed a witness with respect

---

1. Wisconsin Fair Dealership Law, Wis.Stat. § 135.

2. This ruling was affirmed on appeal in *C. A. May Marine Supply Co. v. Brunswick Corp.*, 557 F.2d 1163 (5th Cir. 1977).

to certain charts and information he had compiled, purportedly to aid defense counsel in the preparation of his case on damages. During the deposition the witness was instructed by counsel not to answer questions pertaining to the charts. The attorney claimed that the charts were protected by the "work product" privilege. Counsel for May Marine did not file a motion to compel discovery of this material. Instead, both parties joined in an amendment to the pretrial order which stated that charts and tables of Mercury's experts would not be supplied or identified until the trial court ruled on the appropriate measure of damage.

This determination was not made until the morning of the trial. Charts prepared for use at trial were then shown by Mercury to May Marine in accordance with the amended pretrial order. The charts were used extensively at trial, and, when they were finally tendered, no objections were made to their admissibility. Counsel for May Marine submits that any objection was mooted by the judge's statement prior to admission that "I am going to let them all in for whatever they may be worth. That's for the jury to say."

May Marine sought to introduce into evidence contact reports prepared by Mercury's sales personnel showing the business conditions experienced by other Mercury dealers in the Atlanta area. These reports disclosed that the other dealers uniformly experienced an extreme recession in 1975 followed by great increases in sales during 1976, 1977 and 1978. On objection by Mercury, the contact surveys were excluded. However, the trial court thereafter admitted over objection May Marine's offering of a computer printout showing sales of Mercury outboard motors to Mercury dealers statewide during 1970–1978. The records did not include the sales of motors from the Mercury dealers to the public.

May Marine also offered a customer survey petition maintained at May Marine's business establishment for some six months shortly after the cancellation of the dealership. The survey basically asked the customers three questions: (1) Did May Marine "push the sale of Mercurys"? (2) Did May Marine give "good service"? (3) Should May Marine continue as a "Mercury dealer?" It was May Marine's contention that the survey weighed on the subject of lost future profits because it reflected customer loyalty and the business reputation of May Marine in the community. However, the trial court sustained Mercury's objection and refused to admit the survey on the ground that customer opinion on the merits of the termination was irrelevant.

Mitigation of damages, or the lack thereof, was another issue at the trial. The evidence reveals that May delayed seven months after nonrenewal before meeting with representatives of the manufacturer of Johnson outboard motors. He made no attempt to secure a dealership for the Chrysler line of motors. Although he was party to discussions in November, 1975, directed toward acquisition of an Evinrude motor dealership, he subsequently withdrew his request. Finally, May refused to consider Mercury's December, 1977 offer to reinstate his dealer status. This latter alleged refusal to mitigate, May maintains, was in fact the rejection of a settlement offer made after suit had been filed in 1976.

The trial of damages began on October 10, 1978. Six days later the jury returned a verdict in favor of May Marine in the sum of $7,027.00. May Marine filed a motion for a new trial and, two days later, a bill of costs seeking attorney's fees, despite the trial judge's statement at a chambers conference just before trial that May Marine was not entitled to recover attorney's fees. Mercury filed a motion to review and disallow costs, attacking the attempt to tax as costs May Marine's attorney's fees. On January 29, 1979, the district court passed on the two motions in a single order denying the motion for new trial and disallowing attorney fees as costs. The appellant filed a notice of appeal "from the order filed January 29, 1979, denying plaintiff's motion for new trial." It asserts that the damages award was grossly insufficient and that the trial court erred in its rulings on the charts,

the contact reports, the customer survey and the attorney's fees.

■ It is within the discretion of the trial judge to grant a new trial where the jury verdict is inadequate. A refusal to do so is subject to reversal for abuse of discretion only where the jury's verdict is without factual support in the record. *McKinzie v. Fleming*, 588 F.2d 165 (5th Cir. 1979). We find no abuse here and affirm the district court award of $7,027.00 as compensation for all loss resulting from nonrenewal of the sales contract.

■ In Wisconsin dealership termination cases, standard damage principles apply.[3] As the trial judge instructed the jury, there are two general ways by which this dealer could have proved his damages for breach of the Wisconsin law incorporated in the contract.

■ A showing of the profits lost by the dealer as a result of the breach of contract is the usual and most common procedure to prove the damage. Tr. at 14; *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1945).[4] Where the business is new and the dealer goes out of business before he is able to compile an earnings record, the amount of lost profits is gauged by a "yardstick" study of the business profits of a closely comparable business. *Lehrman v. Gulf Oil Corporation*, 500 F.2d 659, 667 (5th Cir. 1974). Otherwise, the dealer's profit record prior to the violation is compared with his performance subsequent thereto. This method is often called the "before and after" theory. *Lehrman v. Gulf Oil Corporation*, 500 F.2d at 667. Because proof must be specially tailored for each dispute, a party may construct his case with a combination of supporting facts relevant to both lost profits theories. *Lehrman v. Gulf Oil Corporation*, 500 F.2d at 668.

■ Loss of business value is the second major measure of damages in dealership cases. This method focuses upon the change in worth of a going concern after total or almost total destruction caused by a breach of contract. Tr. at 15. For cases discussing aspects of business value damages see generally, *Carpa, Inc. v. Ward Food, Inc.*, 536 F.2d 39 (5th Cir. 1976). Both business goodwill and future profits are computed into the "going concern" value loss. Hence, damage awards which include recovery for lost future profits and "going concern" value are impermissibly duplicitous. *Lehrman v. Gulf Oil Corporation*, 500 F.2d at 664.

The trial judge admitted evidence on both the value and the lost profits concepts and he instructed the jury on their application. In looking back on the jury's verdict, we find the decision to be rational. We surmise that the jury wisely rejected the "going concern" value measure of damages because the business was not totally or almost totally destroyed after the cancellation and the entire diminution of the business' value from $153,468.00 as estimated by the appellant's expert to somewhere between $58,898.00 after termination and $9,989.00 on the date of trial, could not be traced to loss of sale of the Mercury outboard motors. Certainly the appellee could not have foreseen that collapse of the entire business would result from nonrenewal of one product line. *See* Restatement of Contracts, § 330 (1932). Moreover, the alternate lost future profits measure of damages could most easily be calculated by the before and after criteria, rather than the yardstick approach, since May Marine was an ongoing business with a profit record. The award of $7,027.00 is slightly above the yearly average profits of May Marine from

---

**3.** *See Metropolitan Sewage Commission v. R. W. Construction, Inc.*, 78 Wis.2d 451, 255 N.W.2d 293 (1977); *Howard v. State Farm Mutual Auto Liability*, 70 Wis.2d 985, 236 N.W.2d 643 (Wis.1975); *Byrnes v. Mets*, 53 Wis.2d 627, 193 N.W.2d 675 (1972); *Dehnhart v. Waukesha Brewing Co.*, 21 Wis.2d 583, 124 N.W.2d 664 (1963).

**4.** Cases discussing damage issues frequently arise in the antitrust context. Similar conduct often provides the basis for both franchise law and antitrust violation charges. *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 512–516 (10th Cir. 1976). *See generally* Annot., 54 A.L.R.3d 324 (1973).

1969 through 1974. Furthermore, the decision to grant only one year's profit is reasonable. Had the appellant made any effort whatsoever to mitigate his damages by seeking to acquire another product,[5] his actual losses would have been much closer to $7,027.00.

The trial judge's denial of a new trial was correct in light of the adequacy of the jury verdict and the lack of reversible error in the trial. Thus, we reject the appellant's argument that, because of certain evidentiary rulings, the verdict should be vacated and the case remanded for retrial.

█ The exclusion of the contact reports was not erroneous because the information may have misled the jury and was of little relevance. The reports merely contained general comments from various dealers about their businesses, rather than statistical and financial data concerning Mercury outboard motor sales. Moreover, only some 13 of 300 reports were tendered in evidence and, thus, there was presented a very real potential for misconception and distortion. Finally, the relevance of this evidence was questionable, since here lost profits were more appropriately measured by reference to May Marine's own past profitability than by the yardstick method. We note that even if the contact reports should have been admitted, their exclusion was harmless error.[6] Computer printouts showing the outboard motor sales to every Mercury dealer in Georgia from 1970 through 1978 were thereafter admitted and could have been used to draw a more accurate picture of the other dealers' profitability.[7]

█ The trial judge also correctly excluded the customer survey as irrelevant. Surveys and customer questionnaires are admissible, if they are pertinent to the inquiry, upon a showing that the poll is reliable and was compiled in accordance with accepted survey methods. *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552 (7th Cir. 1980). A survey may be of value if the document can demonstrate the participants' then-existing state of mind. *Randy's Studebaker Sales, Inc. v. Nissan Motor Corporation*, 533 F.2d 510, 520 (10th Cir. 1976); *Holiday Inns, Inc. v. Holiday Out In America*, 481 F.2d 445, 447 (5th Cir. 1973). *Cf. Sears, Roebuck & Company v. All States Life Insurance Company*, 246 F.2d 161, 171 (5th Cir. 1957). Such surveys are apparently admitted into evidence most frequently in trade name and trademark cases where the possibility of consumer confusion is at issue. *See James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266 (7th Cir. 1976); *Union Carbide Corporation v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2d Cir. 1975).

The appellant urges that May Marine's survey is admissible as an expression of customer loyalty and of intent to continue dealing with May Marine in the future. Assuming the survey is probative of each signer's state of mind, the survey would withstand a hearsay objection.[8] But the

5. In the pre-trial order, the appellee claimed that May Marine could have mitigated its damages by seeking injunctive relief as authorized by the Wisconsin Fair Dealership Law, by actively seeking an outboard motor dealership from another manufacturer, by curing the reasons for nonrenewal, or by accepting the appellee's offers ultimately to continue with the existing dealership agreement. Record at 348.

6. No error in the exclusion of evidence is grounds for disturbing a judgment, if the error does not affect the substantial rights of the parties. Fed.R.Civ.P. 61 (1970). Because the other admitted evidence could have been used by the appellant to prove its point, it was not

prejudiced by the rejection of the contact reports.

7. Although these printouts reflected manufacturer-to-dealer sales, and not dealer-to-customer sales, the statistics were indicative of the average number of engines ultimately reaching the customer through each dealership. This information would have been an alternative to the proffered contact sheets. Subpoenas could have issued at the plaintiff's request directing dealers to testify and produce relevant statistical data to strengthen its case.

8. All customers need not be polled. Similarly, all the responses from those questioned need not be introduced into evidence. *Randy's*

measure of damages appropriate to this case is lost profits. Evidence tending to show business goodwill is not germane unless it demonstrates a "going concern" value. Furthermore, general predisposition to purchase products at May Marine is not reflective of how many of a certain item would have been purchased, *i. e.* what the quantum of lost profits with regard to the terminated product line would have been. Any minimal relevancy was outweighed by the likelihood that some statements in the poll would prejudicially overemphasize Mercury's role of the "bad guy", a status bearing no relationship to the sum of lost profits.[9] We hold that the trial judge did not commit reversible error in excluding the customer survey.[10]

The demonstrative use of the charts as well as the restriction on deposition testimony concerning them was in accordance with the federal rules and a procedure which the appellant accepted without objection. Consequently, the admission of the charts caused the appellant to suffer no prejudice which would require us to vacate the damages award and remand for a new trial.

The worksheet charts requested by the appellant during deposition had been prepared by an accountant for appellee's counsel to aid in his analysis of the appellant's case. The lawyer for whom the information was compiled sought to terminate this line of discovery by evoking the work product privilege. Fed.R.Civ.P. 26 permits discovery of documents prepared for the opposing party in anticipation of litigation only upon a showing of need and inability to obtain equivalent material elsewhere without undue hardship. Fed.R.Civ.P. 26(b)(3) (1972). There was no undue hardship here; figures utilized by the appellee's accountant were drawn from the appellant's own files.

Even if the work product privilege was impermissibly claimed, the appellant ignored opportunities to raise both that challenge and the contention that the charts were erroneously admitted at the trial. No motion to compel discovery was filed by the appellant. Instead, both lawyers agreed in the amended pretrial order that the appellee should retain its compilations until the trial court ruled on the proper measure of damages. When that decision was made and certain charts were admitted during the trial, the appellant neither objected nor moved for a continuance. In its motion for a new trial, it did not allege prejudicial use of the charts as a ground therefor. Nor did the fact that the trial judge announced his intention to admit the charts for the benefit of the jury negate its duty to make a timely objection.

Although the appellee responded to May Marine's contention that it is entitled to attorney's fees, it raises the question of whether May Marine's notice of appeal confers jurisdiction on this court to consider the disallowance of attorney's fees. The notice of appeal expressly refers to that portion of the order denying the appellant's motion for a new trial. Because the district court's ruling in conference against attorney's fees was not articulated as a ground for new trial, the issue of fees is clearly not raised by appeal from the denial of the motion for new trial. The denial of attorney's fees in the same order is not mentioned. May Marine responds that it specifically designated the order appealed from,

*Studebaker Sales, Inc. v. Nissan Motor Corporation,* 533 F.2d 510, 520–21 (10th Cir. 1976).

**9.** As cited in the appellee's brief, customer statements included:

"This kind of action is surely a sign of the times. Doesn't loyalty mean anything anymore?"

"I think this is a prime example of trying to force small business out."

**10.** If the inadequacies in the survey had been technical, such as the format of the question or the manner in which it was the survey was taken, those shortcomings would have borne on the weight of the evidence, not its admissibility. *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.,* 533 F.2d 510, 521 (10th Cir. 1976); *Holiday Inns, Inc. v. Holiday Out In America,* 481 F.2d 445, 447 (5th Cir. 1973). Because this survey lacked relevance to the issue at hand, however, it would have been error for the court to admit it.

including the day of the order, thereby evidencing its intent to appeal all rulings therein, including the separate holding on the appellee's motion to disallow costs.

 Generally a notice of appeal "shall designate the judgment, order or part thereof appealed from." Fed.R.App.P. 3(c) (1980). However, a policy of liberal construction of notices of appeal prevails in situations where the intent to appeal an unmentioned or mislabeled ruling is apparent and there is no prejudice to the adverse party. *Simpson v. Norwesco, Inc.*, 583 F.2d 1007, 1009 n. 2 (8th Cir. 1978). The party who makes a simple mistake in designating the judgment appealed from does not forfeit his right of appeal where the intent to pursue it is clear. *Kicklighter v. Nails by Jannee, Inc.*, 616 F.2d 734, 738–39 n. 1 (5th Cir. 1980). *See Hammond v. Public Finance Corporation*, 568 F.2d 1362 (5th Cir. 1978); *Jones v. Chaney & James Construction Company*, 399 F.2d 84 (5th Cir. 1968); *Markham v. Holt*, 369 F.2d 940 (5th Cir. 1966). Also, where claims or issues are inextricably entwined, each may be reviewed even though not referred to in the notice of appeal. *Marshall v. Kirkland*, 602 F.2d 1282, 1302 n. 17 (8th Cir. 1979). *See also Comfort Trane Air Conditioning v. Trane Co.*, 592 F.2d 1373 (5th Cir. 1979); *In re Nissan Motor Corporation Antitrust Litigation*, 552 F.2d 1088 (5th Cir. 1977). This circuit tends to be more lenient than other circuits in this respect.

 Where the appellant notices the appeal of a specified judgment only or a part thereof, however, this court has no jurisdiction to review other judgments or issues which are not expressly referred to and which are not impliedly intended for appeal. *See Elfman Motors, Inc. v. Chrysler Corp.*, 567 F.2d 1252 (3d Cir. 1977); *Symons v. Mueller Co.*, 526 F.2d 13 (10th Cir. 1975). In this situation, because the intent to appeal is not apparent, prejudice to the adverse party is likely to result if review is granted. Where parts of the judgment are truly independent, there is more likelihood that the designation of a particular part in the notice of appeal will

be construed as an intent to leave the unmentioned portions undisturbed. *Terkildsen v. Waters*, 481 F.2d 201, 206 (2d Cir. 1973); *9 Moore's Federal Practice* ¶ 203.18 at 3–78 (2d Ed. 1980). The January 27, 1979, order disposed of two separate motions on two separate issues—one a motion for new trial and the other to disallow the bill of costs including the request for attorneys fees. The express mention in the notice of appeal of one part of the order negated any inference of intent to appeal from the order as a whole. We therefore, lack jurisdiction to review the question of the appellant's right to attorney's fees.

The judgment of the district court is AFFIRMED.