# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 23, 2022

Lyle W. Cayce
Clerk

No. 21-30639

———————

UPTOWN GRILL, L.L.C.,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

CAMELLIA GRILL HOLDINGS, INC.,

*Defendant—Appellant/Cross-Appellee*,

———————

CAMELLIA GRILL HOLDINGS, INC.,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

GRILL HOLDINGS, L.L.C.; CHARTRES GRILL, L.L.C., DOING BUSINESS AS GRILL; UPTOWN GRILL OF DESTIN, L.L.C.; RANO, L.L.C.; HICHAM KHODR; K & L INVESTMENTS, L.L.C.; ROBERT'S GUMBO SHOP, L.L.C.,

*Defendants—Appellees/Cross-Appellants*,

———————

CAMELLIA GRILL HOLDINGS, INC.,

*Plaintiff—Appellant/Cross-Appellee*,

No. 21-30639

*versus*

Charters Grill, L.L.C., doing business as Grill; Rano,
L.L.C.; Hicham Khodr; Uptown Grill, L.L.C.; Uptown
Grill of Destin, L.L.C.; K & L Investments, L.L.C.;
Robert′s Gumbo Shop, L.L.C.; Grill Holdings, L.L.C.,

*Defendants—Appellees/Cross-Appellants.*

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:13-CV-6560
USDC No. 2:14-CV-810
USDC No. 2:14-CV-837

---

Before Higginbotham, Higginson, and Oldham, *Circuit Judges.*

Stephen A. Higginson, *Circuit Judge*:

This cross-appeal in a trademark dispute reaches us after years of litigation, including three prior appeals to this Court. We are now presented with appeals of three of the district court's rulings: (1) a ruling denying a motion to dismiss; (2) a ruling entering a permanent injunction; and (3) a ruling denying a motion for Rule 11 and § 1927 sanctions. Across the board, we AFFIRM.

I.

A.

Michael Shwartz and his family owned and operated the Camellia Grill restaurant on Carrollton Avenue in New Orleans for decades. *See Uptown Grill, L.L.C. v. Shwartz*, 817 F.3d 251, 254 (5th Cir. 2016) (hereinafter "*Uptown Grill I*"); *see also Uptown Grill, L.L.C. v. Camellia Grill Holdings, Inc.*, 920 F.3d 243, 245 (5th Cir. 2019) (hereinafter "*Uptown Grill*

No. 21-30639

*II*"). In 1999, Shwartz formed Camellia Grill Holdings, Inc. ("CGH") for the purpose of owning federally-registered Camellia Grill trademarks. *Uptown Grill I*, 817 F.3d at 254.

In 2006, Shwartz agreed to sell the Carrollton restaurant to Hicham Khodr. *Id.* The sale involved three contracts between entities owned by Shwartz and entities owned by Khodr,[1] all executed in August 2006:

1. In the Cash Sale, executed August 11, 2006, Shwartz sold the immovable property located at the Carrollton Avenue location ("Carrollton restaurant") to an entity owned by Khodr for $490,000.

2. In the Bill of Sale, also executed August 11, 2006, Shwartz (through Camellia Grill, Inc. and CGH) sold ownership of "tangible personal property" and certain specific property, including "[a]ll furniture, fixtures and equipment, cooking equipment, kitchen equipment, counters, stools, tables, benches, appliances, recipes, trademarks, names, logos, likenesses, etc., and all other personal and/or movable property . . . located within or upon the property" to Uptown Grill, L.L.C. (owned by Khodr) for $10,000.

3. In the License Agreement, executed August 27, 2006, CGH (Shwartz) alone licensed to Grill Holdings, LLC (Khodr) the right to use certain defined "Marks," including "[a]ll 'Camellia Grill' marks on file with the United States Patent and Trademark Office" and "[a]ll 'trade dress' associated with the 'Camellia Grill' Restaurant," for $1,000,000 plus royalties. The License Agreement also contained

---

[1] For ease of reference, in this opinion the Hicham Khodr-affiliated entities (Uptown Grill, L.L.C., RANO, L.L.C., The Grill Holdings, L.L.C., and Chartres Grill, L.L.C.) are sometimes referred to generally as the "Khodr Parties," and the Michael Shwartz-affiliated entities (Shwartz himself, Camellia Grill Holdings and Camellia Grill, Inc.) are sometimes referred to as the "Shwartz Parties," except where necessary to distinguish between particular entities.

a provision stating that "[u]pon termination of this Agreement, Licensee shall avoid any action or the continuance of any condition which might suggest to the public that Licensee has any right to the Marks, or that Licensee continues to be associated with Licensor" and that, also upon termination, "all rights and privileges granted to Licensee hereunder will immediately cease and will revert to Licensor. Licensee will discontinue use of all Marks."

The Bill of Sale and the License Agreement have been the subjects of extensive state and federal court litigation, as described below. The Carrollton restaurant is the only Camellia Grill-style restaurant currently in operation; however, Hicham Khodr operated a Camellia Grill-style restaurant from 2010 to 2017 on Chartres Street in the French Quarter.

B.

In 2008, The Grill Holdings, L.L.C. (Khodr) filed suit in the Civil District Court for the Parish of Orleans seeking a declaratory judgment as to whether CGH (Shwartz) had the right to audit their books and records under the License Agreement. The state district court ruled in CGH's favor on summary judgment, and the Louisiana Fourth Circuit Court of Appeal denied writ.

In 2011, it was CGH that filed suit in the Civil District Court for the Parish of Orleans, arguing that The Grill Holdings had breached the terms of the License Agreement, and asking for the License Agreement's termination. The Civil District Court granted summary judgment in favor of CGH, declaring the License Agreement to be terminated effective May 25, 2012, "restoring all rights to the licenses marks to the mover," CGH. On appeal, the Louisiana Fourth Circuit affirmed the district court's holding that The Grill Holdings had breached the License Agreement (though the appeals court amended the effective date of termination of the License Agreement to

No. 21-30639

be June 1, 2011). *See The Grill Holdings, L.L.C. v. Camellia Grill Holdings, Inc.,* 120 So. 3d 294 (La. Ct. App. 2013). The Louisiana Supreme Court denied writ.

Of note, neither party asserts that the state courts ever interpreted the Bill of Sale.

C.

While the state court litigation was on appeal, the federal litigation began when CGH filed a complaint in the Eastern District of Louisiana on July 23, 2013 against Grill Holdings (Khodr) and the City of New Orleans seeking to remedy trademark infringement by preventing the city from designating the Carrollton Avenue location as a historic landmark. *Uptown Grill I*, 817 F.3d at 255. The district court denied CGH's motion for a preliminary injunction, *see Camellia Grill Holdings, Inc. v. New Orleans City*, 2013 WL 4431344 (E.D. La. 2013), and thereafter granted CGH's motion for voluntary dismissal. *Uptown Grill I,* 817 F.3d at 255. While the motion for voluntary dismissal was pending, Uptown Grill (Khodr) filed a Complaint for Declaratory Relief against Shwartz, CGH, and Camellia Grill, to determine the parties' respective rights to the ownership and use of the trademarks as to the Carrollton restaurant.[2] *Uptown Grill I*, 817 F.3d at 255.

After CGH's motion for voluntary dismissal was granted, CGH filed in the first state court litigation supplementary pleadings asserting trademark infringement because of continued use of the trademarks even though the License Agreement had been terminated. Grill Holdings removed that case to federal district court, and CGH's motion to remand to state court was denied. The cases were consolidated in the district court. Both parties filed

---

[2] Shwartz characterizes Uptown Grill's suit as a "direct response" to a cease-and-desist letter sent by CGH.

motions for summary judgment. The district court concluded that the Bill of Sale transferred ownership of the trademarks within or upon the Carrollton restaurant to Uptown Grill and then *sua sponte* held that the Bill of Sale in fact transferred *all* of Shwartz's rights in Camellia Grill trademarks to Uptown Grill and that the License Agreement had no effect.

The Shwartz parties appealed, and this Court affirmed the district court's first holding but reversed and remanded on its second. *See generally Uptown Grill I*, 817 F.3d 251. In reaching its holding, we considered whether the doctrine of laches barred the suit. *Id.* at 256-57. We ultimately concluded that it did not, explaining:

> The Shwartz parties argue that because Uptown Grill did not assert rights to the trademarks included in the Bill of Sale during the first five years of their litigation, it should be equitably barred by the doctrine of laches from seeking declaratory relief. To establish laches, the Shwartz parties must prove that Uptown Grill delayed in asserting the rights at issue; that the delay is inexcusable; and that the Shwartz parties have suffered undue prejudice as a result of the delay. The Shwartz parties have not met their burden. Uptown Grill was not a party to any litigation where ownership of the trademarks was at issue until it filed its action for declaratory judgment on December 3, 2013, in response, as previously noted, to CGH's motions in state court attacking use of the trademarks. Uptown Grill did not unreasonably delay in asserting whatever rights in the trademarks the Bill of Sale transferred. In addition, even if the earlier litigation between Camellia Grill, Inc., CGH, and/or any of Khodr's entities could somehow be imputed to Uptown Grill, the License Agreement, not the Bill of Sale, was at issue in those cases. Accordingly, Uptown Grill may not be punished for failing to assert the Bill of Sale in prior litigation, and laches is inapplicable.

*Id.* (citation omitted). We then went on to analyze the Bill of Sale, expressly "declin[ing] the Shwartz parties' invitation to consider parol evidence such as the License Agreement" and concluding that the Bill of Sale "clearly and unambiguously transfers to Uptown Grill the trademarks within or upon the Carrollton Avenue location." *Id.* at 258.

We were less convinced by the district court's *sua sponte* conclusion that Uptown Grill owned *all* of the Camellia Grill trademarks. *Id.* at 258-59. We could not conclude, based on the record, that "the district court's understanding concerning the scope of the parties' agreements was 'tested adversarially.'" *Id.* at 259 (citation omitted). We observed:

> For years, throughout an audit and litigation up to the Louisiana Supreme Court, the parties here consistently treated the License Agreement as valid and binding. While Uptown Grill was never formally involved in the disputes, it is an "affiliate" of Grill Holdings pursuant to Section 4.10 of the License Agreement and, under that provision, is included in the term "Licensee." The "Licensee" under the Agreement is required to cause any "licensee" to abide by the Agreement's provisions, Section 6.4, and the Licensee agrees, in Section 5, that "all of the Licensor's right, title and interest in and to the Marks shall remain the property of the Licensor." The parties have never litigated the proposition that because of the Bill of Sale, the License Agreement did not cover the use of Camellia Grill marks apart from the Carrollton Avenue location. Indeed, they litigated the scope of the License Agreement to the Louisiana Supreme Court, the Khodr parties lost, and as a result they paid CGH's attorneys' fees and ceased using the marks at the French Quarter location.
>
> During this federal court litigation, and wholly consistent with the parties' prior acts and practice, Uptown Grill has only sought a recognition of its right to use the marks at the Carrollton Avenue location. Numerous indications of this limited request for relief appear in Uptown Grill's

pleadings. Further, Section 10.3 of the License Agreement provides that "Licensee will not attack the title or any rights of Licensor in and to the Marks, attack the validity of [the License Agreement], or do anything either by omission or commission which might impair, violate or infringe the Marks." In practice, Uptown Grill's actions demonstrate that it has abided by this provision as an "affiliate" of the Licensee, Grill Holdings.

In sum, while CGH may well be bound by a mis-drafted Bill of Sale, the court must consider whether Uptown Grill should be bound by its pleadings, representations in court, and practice with respect to a License Agreement for which its affiliate, Grill Holdings, paid a million dollars. At least, the court must take all facts and circumstances of the parties' contractual relations, litigation tactics, and applicable trademark law into consideration before reinstating relief plainly beyond the plaintiffs' pleadings.

*Id.* at 259-60 (footnote omitted). Accordingly, the case was remanded to the district court.

Back in the district court, the parties again moved for summary judgment. The district court ultimately ruled, as relevant here, that (1) the Bill of Sale did assign all Camellia Grill trademark rights to the Khodr parties, as well as trade dress rights associated with the Carrollton restaurant; (2) the Shwartz parties could not sustain a trade dress infringement claim on the merits; (3) with respect to the breach of contract claims, the parties were bound by the License Agreement but the Shwartz parties could not prove breach of contract as to the trade dress; and (4) operation of the Chartres restaurant during two time periods was a breach of the License Agreement (the court held a bench trial on this point), but no compensable damages were shown by the Shwartz parties, so an injunction was the only available remedy.

*See Uptown Grill II*, 920 F.3d at 246-47. The Shwartz parties appealed, again,[3] to this Court.

In our *Uptown Grill II* opinion, we first examined whether Shwartz retained any interest in the trademarks after the Bill of Sale, ultimately concluding that he did not. 920 F.3d at 247. We wrote: "[w]ithout looking outside the four corners of the Bill of Sale, and given the technical understanding of the term 'trademark,' the contract unambiguously transfers 'all of [Shwartz's] right, title, and interest' in the Camellia Grill trademarks." *Id.* at 249 (second alteration in original).

We then rejected Shwartz's arguments that the License Agreement allowed him to retain interest. First, we noted that "we cannot look to the later-executed License Agreement to create ambiguity regarding the technical terms used in the Bill of Sale. Given the dictates of trademark law and the technical understanding of trademarks, the Bill of Sale's assignment of the Camellia Grill trademark rights — all of them — is unambiguous." *Id.* We further explained:

> Shwartz argues that finding the Bill of Sale to have assigned all trademark rights to Khodr is in direct tension with the License Agreement. If Shwartz sold all trademark rights to Khodr in the Bill of Sale, then Shwartz could not turn around and license these rights in the License Agreement. There would be no reason for Khodr to pay $1 million to license rights he already owned, or to agree to a contract provision acknowledging that Shwartz retained ownership.
>
> The district court continued to enforce the License Agreement "to the extent permissible under the law" given

---

[3] In fact, this Court had already seen another appeal, in *Shwartz v. Khodr*, 733 Fed. App'x 215 (5th Cir. 2018). That appeal, in which Shwartz brought fraud claims against Khodr, was dismissed for lack of standing and is not relevant to this appeal.

> that all parties have always treated it as valid. The parties appear to have made a mutual mistake as to a material, basic assumption upon which the License Agreement was made: that Shwartz had rights to license. Under Louisiana law, this would render the License Agreement "relatively null." LA. CIV. CODE ANN. art. 2031. Such a contract may be enforced. *Id.* And relative nullity "may be invoked only by those persons for whose interest the ground for nullity [such as mutual mistake] was established, and may not be declared by the court on its own initiative." *Id.* Because Khodr is not attempting to nullify the License Agreement, we will enforce it as far as possible.
>
> However, as this court previously held, the License Agreement does not supersede or modify the Bill of Sale. *[Uptown Grill I]*, 817 F.3d at 258 n.2. Therefore, Shwartz cannot sustain his claims of trademark ownership on the basis of the License Agreement.

*Id.* at 250. We also concluded that the Bill of Sale assigned all of the Camellia Grill trade dress rights to the Khodr parties. *Id.* at 250-51. Because the Bill of Sale assigned all Camellia Grill-associated trademark and trade dress rights to the Khodr parties, we then held that the Shwartz parties' Lanham Act infringement claims "must fail," thereby affirming the district court's conclusion that "infringement damages are unwarranted." *Id.* at 251.

Finally, we considered "whether the License Agreement afforded Shwartz any enforceable contract rights." *Id.* On this question, we first examined the district court's holding that the Shwartz parties could not bring a breach of contract claim based on trade dress because the elements of the putative trade dress were not defined in the License Agreement. We disagreed, offering the following definition of trade dress:

> "Trade dress" is a technical term that can be given its technical meaning. *See* LA. CIV. CODE ANN. art. 2047. Therefore, the elements of a claimed trade dress need not necessarily be articulated in a contract for a party to enforce his rights under

> the contract. Instead, we interpret "trade dress" to mean "the total image and overall appearance of a product [that] may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Test Masters Educ. Servs., Inc.*, 791 F.3d at 565 (quotation omitted).

*Id.* at 251. We then quoted the eight elements identified by the district court as alleged elements of trade dress[4] and "reverse[d] the district court's denial of summary judgment on the trade-dress breach of contract claim and remand[ed] for proceedings to determine if Khodr breached the License Agreement by using the above-detailed alleged trade dress at the Chartres restaurant." *Id.* We also affirmed the district court's ruling that there were no compensable damages based on the use of trademarks and rejected the Shwartz parties' argument that the district court abused its discretion when determining the scope of the injunction by not including in it Hicham Khodr the person (as opposed to his wholly-owned entities). *Id.* at 251-52. Accordingly, the district court's injunction — prohibiting Chartres Grill, The Grill Holdings, and Uptown Grill from using the trademarks at any location other than the Carrollton restaurant — was upheld. *Id.*

Again, the case was remanded. The parties filed more motions. First, the Shwartz parties moved for summary judgment, asking the district court to find that the Khodr parties breached the License Agreement by using

---

[4] These were:

(1) the "straw popping" routine, (2) U-shaped counters, (3) audible order calling routing, (4) pink and green wall scheme, (5) separate pie cases on the rear wall at both ends cooking line, (6) stainless steel stemmed stools with green cushions, (7) individual counter checks handed to each customer, [and] (8) fluted metal design under the counters and above the cooking line.

*Id.* (alteration in original).

Camellia Grill trade dress at the Chartres restaurant after the termination of the License Agreement; next, the Khodr parties filed a motion for partial summary judgement on the trade dress injunction, arguing that the Shwartz parties lacked standing because the Khodr parties were not currently using any trade dress outside of the Carrollton restaurant; then, the Shwartz parties filed a motion to dismiss for lack of jurisdiction under the *Rooker-Feldman* doctrine; and, finally, the Khodr parties filed a motion for sanctions against the Shwartz parties for "abusive and harassing" conduct.

In January 2021, the district court issued an Order and Reasons that (1) denied the Shwartz parties' motion to dismiss for lack of jurisdiction; (2) denied the Khodr parties' motion for sanctions; (3) determined that the Khodr parties had breached the License Agreement's post-termination provisions; and (4) decided that the trade dress elements should be limited to that which is protectable under the Lanham Act and that, because the parties had submitted insufficient evidence to determine the scope of the trade dress, a trial would be held on the issue. *See Uptown Grill, LLC v. Shwartz*, No. 13-6560, 2021 WL 269710 (E.D. La. Jan. 27, 2021).

The Shwartz parties then filed a motion to alter or amend the district court's Order and Reasons. The motion argued that requiring the Shwartz parties to "litigate the Lanham Act in enforcing remedies in a breach of contract claim is an error of law and manifest injustice," because it would "result in significant unnecessary litigation and expense to the Court and the parties in relitigating an inapplicable trade dress infringement issue." Instead, the Shwartz parties asked the district court to enter an injunction based on the language of the License Agreement that would enjoin the Khodr parties from "employing any action or the continuance of any condition which might suggest to the public that Khodr has any right to the Camellia Grill trade dress, or that Khodr continues to be associated with Camellia Grill

No. 21-30639

Holdings beyond the Carrollton Avenue location." The Khodr parties opposed any modification.

The district court subsequently amended its original Order and Reasons to grant the Shwartz parties' request for an injunction instead of a bench trial; however, the court did not issue an injunction based on the language of the License Agreement, but rather one based on the eight alleged elements of trade dress identified by us in *Uptown Grill II.* The district court stated that "[t]he enjoined parties' utilization of all or most of the above Camellia Grill trade dress elements at any single location will constitute a violation of this injunction." *See Uptown Grill, LLC v. Shwartz*, No. 13-6560, 2021 WL 3772065 (E.D. La. Aug. 25, 2021).

Again, the parties appealed to this Court. First the Shwartz parties appealed, arguing that the district court erred in denying the *Rooker-Feldman* motion to dismiss and in the scope of its permanent injunction. Next, the Khodr parties cross-appealed, arguing that the district court erred in denying the motion for sanctions.

## II.

We begin by deciding whether the district court erred in denying the Shwartz parties' motion to dismiss for lack of subject matter jurisdiction based on the *Rooker-Feldman* doctrine. In denying the motion, the district court made two alternative holdings: (1) that the motion to dismiss should be analyzed under Federal Rule of Civil Procedure 60(b)(4) rather than Rule 12 and, as such, did not warrant disturbing the court's final order;[5] and (2) that,

---

[5] On appeal, the parties continue to dispute whether the motion should have been properly analyzed under Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3), rather than Rule 60(b)(4). Under Rule 12(b)(1), a party may move to dismiss for lack of subject-matter jurisdiction; under Rule 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(b)(1);

even assuming that the motion should be analyzed under Rule 12(b)(1) and 12(h)(3), it would nevertheless fail to satisfy the *Rooker-Feldman* doctrine. Because we uphold the district court's conclusion that *Rooker-Feldman* does not apply, we do not reach the procedural question.

## A.

"'Reduced to its essence, the *Rooker-Feldman* doctrine holds that inferior federal courts do not have the power to modify or reverse state court judgments' except when authorized by Congress." *Truong v. Bank of Am., N.A.*, 717 F.3d 377, 382 (5th Cir. 2013) (quoting *Union Planters Bank Nat'l Ass'n v. Salih*, 369 F.3d 457, 462 (5th Cir. 2004)). The doctrine[6] is jurisdictional. *Id.* at 381. It is confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).[7] "[I]n addition to the precise claims presented to the state court, *Rooker-Feldman* prohibits federal court review of claims that are 'inextricably intertwined' with a state court decision." *Burciaga v.*

---

12(h)(3). Under Rule 60(b)(4), "[o]n motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: . . . (4) the judgment is void." FED. R. CIV. P. 60(b)(4). Because (as discussed below) we do not find that the court was deprived of subject-matter jurisdiction, we do not reach the issue of which rule applies. Under either rule, the motion fails.

[6] The *Rooker-Feldman* doctrine derives from two Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

[7] *See also Houston v. Venneta Queen*, 606 Fed. App'x 725, 730 (5th Cir. 2015) (unpublished) (citing *Exxon*, 544 U.S. at 284, to list four elements of the doctrine: "(1) a state-court loser; (2) alleging harm caused by a state-court judgment; (3) that was rendered before the district court proceedings began; and (4) the federal suit requests review and reversal of the state-court judgment").

*Deutsche Bank Nat'l Trust Co.*, 871 F.3d 380, 384-85 (5th Cir. 2017) (citation omitted). However, "in light of the narrow ground *Rooker-Feldman* occupies," the doctrine "does not prohibit a plaintiff from presenting some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which [the plaintiff] was a party." *Truong*, 717 F.3d at 382 (2013) (cleaned up). We review "the district court's determination that *Rooker-Feldman* does not apply de novo." *Burciaga*, 871 F.3d at 384.

The district court concluded that *Rooker-Feldman* does not apply to this case because (1) the case was not brought by a state-court loser and (2) the case does not constitute a complaint of an injury caused by a claim "inextricably intertwined" with a state court decision. We agree with the second reason, and so need not address the first.

### B.

"The second hallmark of the *Rooker-Feldman* inquiry is the source of the federal plaintiff's alleged injury." *Truong*, 717 F.3d at 382. "'[I]f a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision, *Rooker-Feldman* bars subject matter jurisdiction in federal court.'" *Id.* at 382-83 (quoting *Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003)); *see also Morris v. Am. Home Mortg. Servicing, Inc.*, 443 Fed. App'x 22, 24 (5th Cir. 2011) (unpublished) (holding claims barred by *Rooker-Feldman* where "crucially, the only relief [the plaintiff] sought was the setting aside of the state foreclosure judgment . . . . This demonstrates that his injuries arose from the state court judgments").

The Shwartz parties argue that the conclusions of this Court and the district court run counter to the state courts' holding that assigned all

trademark rights to Shwartz based on the License Agreement.[8] However, *Rooker-Feldman* "does not prohibit a plaintiff from presenting some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party." *Truong*, 717 F.3d at 382 (cleaned up); *see also Weaver v. Tex. Capital Bank N.A.*, 660 F.3d 900, 904 (5th Cir. 2011) ("[T]he *Rooker-Feldman* doctrine generally applies only where a plaintiff seeks relief that directly attacks the validity of an existing state court judgment.").

Here, the claims are independent. The litigation in federal court has been centered on the Bill of Sale, which neither party argues was interpreted by the state courts. In 2016, when examining the laches issue, we held that "even if the earlier litigation between Camellia Grill, Inc., CGH, and/or any of Khodr's entities could somehow be imputed to Uptown Grill, the License Agreement, not the Bill of Sale, was at issue in those cases." *Uptown Grill I*, 817 F.3d at 256.[9] We went on to conclude that the Bill of Sale transferred to

---

[8] In 2013, the Louisiana Fourth Circuit Court of Appeal held that:

> Because we find that the License Agreement is clear and explicit and thus should not be subject to any further interpretation by the court, and because Grill Holdings was in default of the License Agreement and failed to cure the breaches within the periods set forth in the agreement, we find that the trial court properly granted Camellia Grill's motion for summary judgment.

*Grill Holdings, L.L.C. v. Camellia Grill Holdings, Inc.*, 120 So. 3d 294, 302 (La. Ct. App. 2013).

[9] In response, Shwartz argues that: "It is true that the state courts did not litigate a dispute regarding CGH's ownership because ***it was not contested at any point by the Khodr Parties.*** In the five-year time frame in which the state court cases were being litigated, the Khodr Parties ***never once*** attempted to contest either the 2009 or 2013 state court opinions holding that CGH owned the Camellia Grill intellectual property." To the extent this argument is based on laches, however, we already addressed that argument in 2016 and concluded that it did not bar the present suit. *See Uptown Grill I*, 817 F.3d at 256-57.

No. 21-30639

Uptown Grill the trademarks within or upon the Carrollton Avenue location, and we "decline[d] the Shwartz parties' invitation to consider parol evidence such as the License Agreement in interpreting the Bill of Sale." *Id.* at 258 (footnote omitted). We also "reject[ed] the Shwartz parties' argument that the License Agreement supersedes the Bill of Sale, thereby preserving CGH's ownership of the trademarks." *Id.* at 258 n.2. We addressed the License Agreement again in *Uptown II*, noting that it could be enforced as a "relative nullity" but reiterating that, "as this court previously held, the License Agreement does not supersede or modify the Bill of Sale." 920 F.3d at 250. Accordingly, we hold that this federal litigation did not directly attack the state court judgments nor invited district court rejection of those judgments. Thus, *Rooker-Feldman* does not apply.

## III.

We turn next to the injunction entered by the district court. Generally, we review a trial court's grant or denial of a permanent injunction for abuse of discretion. *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016). The Court reviews the district court's findings of fact under the clearly erroneous standard and its conclusions of law under the de novo standard. *Id.*

The injunction provides:

In crafting this injunction, the Court looks specifically to the definition of "trade dress" utilized by the Fifth Circuit in its May 29, 2019 opinion. "Trade dress" is defined as "the total image and overall appearance of a product [that] may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." The alleged elements of trade dress include: (1) the pink and green interior paint scheme, (2) the "U-Shaped" double horseshoe counter design, (3) the stainless steel stemmed stools with green stool cushions, (4) the fluted metal design under the customer side of the

counter and above the cooking line, (5) the visible pie cases attached to the rear wall at both ends of the cooking line, (6) the "straw popping" routine, (7) audible order calling routine, and (8) the individual counter checks handed to each customer. The enjoined parties' utilization of all or most of the above Camellia Grill trade dress elements at any single location will constitute a violation of this injunction.

The Shwartz parties now argue that the injunction should have been broader in scope — that it should be based on the language of the License Agreement, enjoining the Khodr parties from employing *any* action or the continuance of *any* condition which might suggest to the public that Khodr had the right to the Camellia Grill trade dress or that Khodr continued to be associated with Camellia Grill Holdings beyond the Carrollton restaurant. The Khodr parties, on the other hand, either maintain that the injunction is proper or suggest interpretation of it to require infringement of *all* eight features in combination.

On appeal, the Shwartz parties raise two primary issues with the district court's permanent injunction: (1) that the injunction should prohibit the Khodr parties from using any single element; and (2) that the injunction should include the element of wait staff attire. We find no abuse of discretion on the part of the district court's denial of these two arguments.

As for the first issue, the Shwartz parties primarily urge that the injunction must prohibit the use of *any* of the eight elements of trade dress. Yet we see no abuse of discretion where the district court adhered to our recitation of these eight elements, albeit adding the less precise language "all or most." *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 632 (6th Cir. 2002) ("If [Abercrombie's] trade dress really comprises all nine elements acting in concert to create its overall look, an injunction to prohibit marketing a line of clothing bearing a confusingly similar overall look would probably do the company little good, as American

could easily drop a few items from its line . . . and thereby begin marketing a dissimilar line of products."). Unlike other cases in which injunctions referencing trade dress have been reversed for vagueness, the injunction set forth by the district court here has much more detail than a general prohibition from employing "confusingly similar" trade dress. *See, e.g., John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 984-85 (11th Cir. 1983) (where district court had entered an injunction ordering defendant not to use trade dress which was "confusingly similar to the trade dress or overall appearance of plaintiff's Memory Stub check products or is likely to cause confusion therewith…", remand for "entry of an order which specifically described the acts which are prohibited by the permanent injunction"); *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 748 (2d Cir. 1994) (trademark case where the injunction prohibited defendant from "violating any of Sterling's rights in the trademark and trade name…under the Lanham Trademark Act," it would be "too onerous a burden" for defendant to "guess—on pain of contempt—at what conduct the Lanham Act proscribes."); *Boost Oxygen, LLC v. Oxygen Plus, Inc.*, 477 F. Supp. 3d 871, 885 (D. Minn. 2020), *aff'd*, 843 Fed. Appx. 322 (Fed. Cir. 2021) (consent judgment enjoining defendant from using a trade dress that was "confusingly similar" to plaintiff's trade dress was impermissibly vague and added nothing to what the law already requires—thus, it could not support a finding of contempt); *cf. Fleet Feet, Inc. v. Nike, Inc.*, 986 F.3d 458, 463-64 (4th Cir. 2021) (describing "confusingly similar" language as "common in trademark case injunctions" where "[s]uch language does no more than warn the alleged infringer against 'making an insignificant change in the mark to avoid the injunction and then using the altered mark in a confusingly similar

manner.'" (quoting *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 609 (6th Cir. 1991)).[10]

The Shwartz parties' second argument, that wait staff attire should have been included in the elements of trade dress, is complicated by the long procedural history of this case. The elements appear to have first been collected when the district court ruled, in May of 2017, that those eight elements had been identified to a sufficient extent such that the Khodr parties were on notice of them. Then, as observed above, the eight elements were picked up and quoted by us (in 2019) in *Uptown Grill II*; the case was then remanded "for proceedings to determine if Khodr breached the License Agreement by using the *above-detailed* alleged trade dress at the Chartres restaurant." *Uptown Grill II*, 920 F.3d at 251 (emphasis added). There was no room on remand for reconsideration of the alleged elements that constituted trade dress. Thus, the district court did not abuse its discretion by leaving wait staff attire out of the injunction.

IV.

Finally, we turn to the Khodr parties' cross-appeal.[11] Federal Rule of Civil Procedure 11(c)(2) requires that a motion for sanctions "must be

---

[10] To the extent that the Shwartz parties separately complain of the "all or most" language of the injunction as too vague to notify the enjoined parties of the conduct the injunction prohibits, this argument is insufficiently briefed. They cite no caselaw, nor even give reference to Federal Rule of Civil Procedure 65(d), and instead only predict further litigation. This approach may be because the Shwartz parties themselves declined a trial on the trade dress definition in the district court.

[11] The Shwartz parties argue that we should disregard the cross-appeal as improperly filed. We decline to do so. Though the cross-appeal was not properly docketed initially, the text of the notice does "clearly evince[] the party's intent to appeal," *Mosley v. Dozby*, 813 F.2d 659, 660 (5th Cir. 1987) (citation omitted), and it identifies both the parties and the Order and Reasons, entered by the district court, that denied the motion for sanctions. Thus, this case is distinguishable from other cases cited to by the Shwartz parties in which appeals were denied. *See Shipp v. General Motors Corp.*, 750 F.2d 418, 428 (5th Cir.

served" on the opposing party and "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." This "safe harbor" provision in Rule 11 is a mandatory prerequisite for a Rule 11 motion. *See Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995). Here, after the Khodr parties filed a motion for sanctions arguing that the Shwartz parties should be sanctioned for filing the *Rooker-Feldman* motion to dismiss, the district court denied the motion for failing to satisfy Rule 11's safe harbor provision. The court explained:

> [T]he final Motion for Sanctions that Khodr filed with this Court contained substantial deviations from the draft version Khodr served upon Shwartz. These alterations include the addition of argument and case law under 28 U.S.C. § 1927, the addition of argument and case law relating to "legally indefensible" filings, and a change in the relief requested. Accordingly, even if the pleading need not be identical, this Court finds substantial differences between Khodr's served and filed motions, thereby rendering Khodr's Motion procedurally deficient. Accordingly, Khodr's Motion for Rule 11 Sanctions is denied.

The Khodr parties appealed, arguing that it was error for the district court to deny sanctions.

We review a district court's interpretation of a Federal Rule of Civil Procedure de novo, as an issue of law. *See Basha v. Mitsubishi Motor Credit of Am., Inc.*, 336 F.3d 451, 453 (5th Cir. 2003); *Coleman v. United States*, 912 F.3d 824, 828 (5th Cir. 2019). Several district courts in the Fifth Circuit have

---

1985) (in which the party "never filed a notice of cross-appeal"); *C.A. May Marines Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1055-56 (5th Cir. 1981) (in which the notice of appeal expressly mentioned only one part of an order as being appealed, and the appellant then attempted to challenge the other part of the order as well on appeal).

held, as the district court in this case did, that the motion served and the motion filed must be identical to comply with Rule 11.[12] However, we have yet to address the issue of identicality.

The closest we have come to interpreting the safe harbor provision of Rule 11 was in *In re Pratt*, 524 F.3d 580 (5th Cir. 2008).[13] In that case, the party moving for sanctions had served warning letters instead of copies of the motion for sanctions. *Id.* at 586. This Court noted that the Fourth, Eighth, Ninth, and Tenth Circuits had all concluded that informal notice was not sufficient to comply with Rule 11, though the Seventh Circuit allowed warning letters. *Id.* at 587-88. We then held:

> We are not persuaded that informal service is sufficient to satisfy the service requirement of Rule 9011 . . . . [T]he plain language of Rule 9011 mandates that the movant serve the respondent with a copy of the *motion* before filing it with the court. There is no indication in Rule 9011 (or Rule 11) or in the advisory notes to support Cadle's contention that a motion for sanctions may be filed with the court without serving the respondent with a copy at least twenty-one days in advance. Moreover, we have continually held that strict compliance with Rule 11 is mandatory. We may not disregard the plain language of the statute and our prior precedent without evidence of congressional intent to allow "substantial compliance" through informal service.

---

[12] *See, e.g., Thabico Co. v. Kiewit Offshore Servs., Ltd.*, No. 2:16-CV-427, 2017 WL 3387185, at *5 (S.D. Tex. Aug. 7, 2017) (Ramos, J.) ("Rule 11(c)'s safe harbor provisions are strictly construed and require Kiewit to have served its motion for sanctions in identical form at least 21 days prior to presenting it to the Court for a ruling.").

[13] Though the rule at issue in *In re Pratt* was Federal Rule of Bankruptcy Procedure 9011, the Court referred to Rule 11 jurisprudence because the rules are "substantially identical." *In re Pratt*, 524 F.3d at 586.

No. 21-30639

*Id.* at 588 (footnote omitted). Thus, though *In re Pratt* did not specifically address the facts of this case, it did favorably discuss strict compliance with Rule 11.[14]

We hold today that the Rule 11 safe harbor provision requires identicality. Here, as the district court found, the served motion and the filed motion contained substantial differences. The motions were thus not identical, and the district court properly denied the motion and declined to enter sanctions.[15]

---

[14] The parties do not cite any other Fifth Circuit caselaw directly addressing the issue before us today. However, they do cite two unpublished cases that addressed somewhat similar issues. In *Askins v. Hagopian*, 713 Fed. App'x 380, 381 (5th Cir. 2018), this Court held that neither an email stating that the lawsuit was frivolous nor a copy of the Rule 11 motion given the same day instead of 21 days in advance complied with the safe harbor provision. In *Margetis v. Furgeson*, 666 Fed. App'x 328, 331-32 (5th Cir. 2016), this Court rejected a safe harbor argument based on the fact that the magistrate judge had recommended dismissal of the complaint during the 21 days, explaining plaintiffs "could have formally or informally disavowed their claims during the 21-day-period after Defendants served their motion," since the district court did not adopt the recommendation for several months.

[15] The Khodr parties also briefly argue that the district court should have granted sanctions and awarded fees and costs under 28 U.S.C. § 1927. The district court did not separately address the § 1927 request, other than to note that it was not made in the draft motion. The Khodr parties argue that this was error, as § 1927 does not contain a safe harbor requirement. *See* 28 U.S.C. § 1927 ("Any attorney. . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."). Yet we have explained that the imposition of § 1927 sanctions is a decision "committed to the sound discretion of the court imposing them; we review only for abuse of that discretion." *Travelers Ins. Co. v. St. Jude Hosp.*, 38 F.3d 1414, 1417 (5th Cir. 1994). Furthermore, § 1927 sanctions require a higher level of proof than Rule 11 sanctions. *See Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 694 (5th Cir. 2010). The Khodr parties made their § 1927 sanction request in a brief and conclusory manner in a filing titled "Motion for Rule 11 Sanctions." The district court did not abuse its discretion by implicitly finding that the Shwartz parties did not vexatiously multiply proceedings. *See, e.g.*, *Rossello-Gonzalez v. Acevedo-Vilai*, 483 F.3d 1, 7 (1st Cir. 2007).

No. 21-30639

V.

For the foregoing reasons, we AFFIRM.